Filed 6/24/14

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D063686 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS222375) |
| PABLO EMMANUEL DIAZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Alvin E. Green, Judge.  Reversed in part; affirmed in part; remanded with directions.

Lynda A. Romero, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Scott C. Taylor, Deputy Attorneys General, for Defendant and Appellant.

---

[*] Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part III.B.

# I.

## INTRODUCTION

In the first of two trials in this case, a jury found Pablo Emmanuel Diaz guilty of gross vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (a)) (count 2), driving under the influence causing injury (Veh. Code, § 23153, subd. (a))[1] (count 3), driving with a measurable blood alcohol causing injury (§ 23153, subd. (b)) (count 4), and driving with a suspended license for an alcohol-related offense with a prior conviction (§ 14601.1, subd. (a)) (count 5). With respect to counts 2 through 4, the jury also found that Diaz caused bodily injury or death to more than one victim, within the meaning of section 23558, and that he personally caused great bodily injury, within the meaning of Penal Code section 12022.7, subdivision (b). With respect to counts 3 and 4, the jury also found that Diaz had suffered two or more prior offenses for driving under the influence (§§ 23626, 23546) and that he drove 20 or more miles per hour over the posted speed limit (§ 23582, subd. (a)). With respect to count 5, the jury found that Diaz had suffered a prior conviction for violating section 14601.5, subdivision (a) within the previous five years. The jury was unable to reach a verdict on the charge of murder (§ 187) (count 1), and the trial court declared a mistrial as to that count.

The People later retried Diaz on the murder count, and the jury in the retrial found Diaz guilty of murder. The trial court sentenced Diaz to an aggregate term of 23 years to

---

[1]    All subsequent statutory references are to the Vehicle Code, unless otherwise specified.

2

life. The court imposed a sentence of 15 years to life on count 1. The court also sentenced Diaz to a consecutive eight-year term on count 3, consisting of a three-year term on the underlying offense and an additional five years for the great bodily injury enhancement. The court imposed and stayed sentences on counts 2 and 4 pursuant to Penal Code section 654, and sentenced Diaz to time served on count 5.[2]

On appeal, Diaz claims that the trial court erred in permitting the jury in the retrial on the murder charge to view two videos concerning the consequences of alcohol-related driving offenses. The videos include numerous tearful testimonials from the families of victims of alcohol-related offenses, statements from a prosecutor and a defense attorney concerning the high rates of convictions for such offenses, and statements from a judge to the effect that punishment is needed and is effective for alcohol-related driving offenses.

We conclude that the trial court erred in permitting the jury to view the videos. We further conclude that the error was prejudicial. Not only did the prosecutor repeatedly refer to the videos during closing argument, the jury asked questions during deliberations concerning subjects that were discussed only in the videos. Moreover, the record clearly indicates that the jury viewed this as a close case, having twice reported to the judge that it was deadlocked. Finally, in the first trial, a jury that was not shown the videos was unable to reach a verdict on the murder charge. Under these circumstances, there is a reasonable

---

[2] With respect to counts 3 and 4, the court also dismissed, in the interests of justice, the true findings that Diaz had suffered two or more prior offenses for driving under the influence (§§ 23626, 23546) and that he drove 20 or more miles per hour over the posted speed limit (§ 23582, subd. (a)).

probability that Diaz would have received a more favorable result, but for the trial court's error in permitting the jury to view the videos.[3]

Diaz also claims that his convictions on counts 3 and 4 must be reversed because they are lesser included offenses of count 2. In the unpublished portion of this opinion, we conclude that reversal is not required on either count 3 or count 4 because the People presented evidence that the offenses charged in counts 3 and 4 were committed against different victims from the offense in count 2.

Accordingly, we reverse the murder conviction, affirm the convictions on the remaining counts, and remand the matter to the trial court with directions to permit the People to retry Diaz on the murder charge.

## II.

## FACTUAL BACKGROUND[4]

A.     *Diaz's drinking prior to the crash*

On August 28, 2008, Diaz drove his friends, Rolf Alvarez, Sergio Martinez, and Victor Sanchez, to a grocery store to purchase a 12-pack of beer, and then to a bar. On the way to the grocery store, Diaz was driving fast. Alvarez told him to slow down. The

---

[3]     In light of our reversal of Diaz's murder conviction, we need not consider Diaz's contention that the trial court improperly coerced the jury's guilty verdict on the murder charge through the manner by which the court responded to various questions that the jury posed during deliberations.

[4]     Because Diaz's primary argument on appeal pertains to an error that allegedly occurred in his second trial, we base our factual background on evidence presented at that trial.

group drank beer on the way to the bar, and finished the 12-pack in the parking lot of the bar. They entered the bar at around 12 a.m.

While at the bar, Diaz consumed several mixed drinks. Martinez estimated that Diaz and Sanchez went to the bar to get drinks about six times. They stayed at the bar until approximately 1:00 or 1:30 a.m. According to Alvarez, by that time, Diaz was "drunk." Martinez decided to leave the bar with his girlfriend. Before leaving, Martinez told Alvarez to take the car keys away from Diaz.

In the parking lot of the bar, Alvarez twice asked Diaz if Alvarez could drive. Diaz insisted on driving and began to drive the three men from the bar. Diaz drove to a house party a couple of miles from the bar. During the ride to the party, Diaz drove so fast that Alvarez asked him to slow down twice. Each time, Diaz slowed down and then sped up again.

B.      *The crash*

Alvarez, Sanchez, and Diaz stayed at the party for approximately 20 minutes. When they left the party, Diaz started to drive the group to a fast food restaurant. Diaz was driving fast again. Alvarez told Diaz to slow down several times, but Diaz would slow down only briefly. Alvarez told Diaz to slow down one last time, but Diaz did not slow down. Diaz struck a curb and lost control of the car. The car became airborne, slid on its side, and hit a pole and a fence.

Rescue personnel arrived at the scene. They determined that Sanchez was dead.[5] Diaz did not appear to be injured, but did appear to be intoxicated.

C.     *The investigation of the crash*

An inspection of Diaz's car after the crash did not reveal any mechanical failures that would have caused the crash. In addition, it appeared that Diaz had not applied the brakes at the time of the crash.

An expert in accident reconstruction testified that, just prior to the crash, Diaz's car was traveling at approximately 102 miles per hour and that it appeared that Diaz had pushed the accelerator to the floor.

D.     *Diaz's intoxication*

Diaz's blood was drawn at the scene of the crash. Testing determined that he had a .21 percent blood alcohol level. An expert testified that Diaz would have had to consume about 14 standard drinks to reach that level. The expert also testified that Diaz's blood alcohol level was likely between .22 and .23 percent at the time of the crash.

E.     *Diaz's prior convictions for drinking and driving and his participation in mandatory alcohol education programs*

At the time of the crash, Diaz's driver's license was suspended. He had suffered two prior convictions for driving with an elevated blood alcohol level. Diaz pled guilty in both prior cases. In connection with both prior convictions, Diaz initialed a form that warned of the dangers of drinking and driving, including a statement that provided, "If I

---

[5]     During the first trial, the People presented evidence that Alvarez was rendered a quadriplegic as a result of the crash.

6

continue to drive while under the influence of alcohol or drugs, or both, and as a result of my driving, someone is killed, I can be charged with murder."

After suffering his first conviction, Diaz was ordered to attend a mandatory alcohol education program offered by an entity called Maximizing Access to Advance Our Communities (MAAC). Diaz registered for the MAAC program on December 3, 2007, but did not complete the program and was terminated in May of 2008. Prior to his termination from the program, Diaz had completed the first three education sessions, one group session, eight one-on-one sessions, and 12 self-help meetings.

During one of the MAAC sessions that Diaz attended, he viewed a video entitled "Crossing the Line." (MAAC Video) The video focused on the consequences of alcohol-related driving offenses in Delaware. Diaz also attended a mandatory education class offered by Mothers Against Drunk Driving (MADD) in which he viewed a video (MADD Video) that concerned the impact that two alcohol-related traffic fatalities had on the victims' families. The prosecution played both the MAAC Video and the MADD Video for the jury.

DISCUSSION

A.   *The trial court committed reversible error in permitting the jury to view the MAAC Video and the MAAD Video*

Diaz claims that the trial court committed reversible error in permitting the jury to view the MAAC Video and the MADD Video.

1.   *Factual and procedural background*

a.   *Proceedings concerning the admissibility of the videos*

Prior to Diaz's retrial on the murder charge, the People filed a motion in limine seeking permission to offer evidence that, prior to the crash in this case, Diaz had attended portions of the two mandatory alcohol education programs referred to in part II.E., *ante*. The People also sought permission to offer in evidence the two videos that Diaz had viewed at the classes that he had attended. The People did not describe the content of the videos in their motion, but provided the court with transcripts of the MAAC Video and the MADD Video.

The People argued that the videos were relevant to demonstrate that Diaz was aware of the dangers of drinking and driving. The People further argued that the "content of videos and lectures" had been found to be admissible "to the extent [they] contributed to the defendant's awareness of the danger of [driving under the influence]." (Citing *People v. Murray* (1990) 225 Cal.App.3d 734, 745 (*Murray*).) The People maintained that the trial court should not exclude either video from evidence pursuant to Evidence Code

section 352 because "the People need to show what [Diaz] knew about the perils of driving impaired when he got into his vehicle on [the night of the crash.]"

After conducting an off-the-record discussion concerning the admissibility of the videos, the trial court held a hearing on the subject. The court stated at the outset of the hearing that it had read transcripts of both videos, but that it had not viewed the MADD Video.[6] The court stated that its tentative ruling was to permit the People to "use both the [MAAC] and the MADD videos." The court indicated that it agreed with the prosecutor that the videos depicted two different perspectives concerning the consequences of consuming alcohol and driving. According to the trial court, the MAAC Video focused primarily on the defendant's perspective "in terms of what he experiences," after committing an alcohol-related driving offense, while the MADD Video "was looking at . . . the damage that can be done" as a result of an alcohol-related driving offense.

Defense counsel "strenuously objected" to the admission of the videos. Counsel argued that the MADD Video contained highly emotional content, and that to permit the People to show the video at trial would allow the People to "play[] to the sentiment and heart strings of the jury." Counsel also argued:

> "It's talking about . . . [how the victim's] surviving family was
> devastated, this is a travesty, I could go on and on. I went through
> and underlined all the emotional words, it seems like a good third of
> the transcript has been underlined by me."

---

6    The court later indicated that it also had not viewed the MAAC Video prior to ruling on its admissibility.

9

Defense counsel also argued that the circumstances of one of the cases discussed in the MADD Video were "eerily similar to the facts in this case," thereby increasing the potential for prejudice. In addition, counsel argued that the MADD Video was cumulative to other evidence that demonstrated Diaz's awareness of the dangers of drinking and driving.

The People argued that the videos were admissible to show the "state of mind of the [Diaz]," in order to prove malice aforethought. The People further argued that case law established that "videos and lectures are . . . admissible to the extent that [they] contributed to the [defendant's] awareness." The prosecutor also contended that the MADD Video was not cumulative in that it contained "a completely different perspective."

Defense counsel reiterated his arguments that the prosecutor had numerous other ways to prove that Diaz was aware of the dangers of drinking and driving, and that the circumstances of one of the cases discussed in the video were very similar to the circumstances of the charged offense and therefore, highly prejudicial. Defense counsel also argued that the video "excerpts from these two parents who lost their kids [on the MADD Video] is absolutely more prejudicial than probative in the sense that it inflames the passions of the jury." Counsel noted that at one point in the video, a mother of a deceased victim of a drunk driving crash discusses:

10

"going to the mortuary and talking about feeling pain and desperation and then this mother who wanted to change her dead son's clothing at the mortuary and wasn't allowed to. Just reading in the hallway, I mean, it caused me to almost tear up. I just don't think that it's proper in a murder trial to bring that in . . . ."

After hearing argument from counsel, the trial court ruled that it would not exclude the videos pursuant to Evidence Code section 352 and that the People would be permitted to show the videos at trial. The court acknowledged that one of the cases discussed in the video was "very similar" to the circumstances of the charged offense, that the video was "emotional," and that it pulled at "heart strings." The court stated, "I could go either way because there are so many issues in terms of would it be too prejudicial."[7] However, the court ultimately reasoned that the videos were "more probative than prejudicial" in that Diaz had watched the videos, and had nevertheless done "the exact same thing that he saw in the video."

      b.    *The MAAC Video*

During the trial, the People played for the jury an unedited version of the MAAC Video. The video, entitled "Crossing the Line,"[8] is approximately 29 minutes in duration. It shows the aftermath of several car crashes that occurred in the state of Delaware, including an alcohol-related crash in which a passenger was killed and a second victim

---

[7]     At another point in its ruling, the trial court stated, "[T]here are strong arguments on both sides," and "I don't disagree there are elements you could argue very strenuously the other way. . . ."

[8]     The video has been transmitted to this court as an exhibit.

11

was seriously injured, and another alcohol-related collision in which a drunk driver was rendered permanently brain damaged. Graphic crime scene photographs, newspaper headlines, and photographs of the injured and of deceased while they were alive are displayed throughout the video.

The video begins with an inmate, David Bond, discussing an alcohol-related crash in which he was the driver, his former girlfriend, Jill Sauder, was seriously injured, and his friend, Debbie De Santo, was killed. Bond is depicted in a jail cell with the words "Criminal Negligent Homicide" printed on the screen. At one point, Bond states that he had been pulled over on several occasions before the crash, but that he had passed sobriety tests.

In describing the crash, Bond states, "I definitely did not have the proper frame of mind . . . to operate a motor vehicle that night. One beer would be too many. Um, I know this now, but four to five, I shouldn't have even thought about it." A state trooper also discusses the crash and the evidence that he gathered after the crash. De Santo's sister and Sauder tearfully speak about De Santo's death, while the video displays newspaper headlines and grave markers. Bond's father talks about the crash and says, "It almost pales by comparison when you look at what happened to [De Santo's] family and what happens to our family, by comparison, because [my son] will be with us."

Bond's defense counsel states, "[I]t's pretty clear in Delaware at least, that no matter who you are or where you come from, if you go to trial and you get convicted, you're gonna go to jail for a considerable period of time and the jail sentences are getting longer

12

and longer." He also states, "[N]o matter how good of a lawyer that you get, if the facts aren't in your favor and if there's nothing to work with . . . and if the jury rejects what your arguments are, it doesn't matter. It doesn't matter how much you pay that lawyer, it doesn't matter whether you bring somebody from, uh, California . . . who makes millions of dollars. Uh, the bottom line is the same in Delaware. If you get convicted of this type of a crime, you're gonna go to jail no matter who you are."

A Delaware deputy attorney general states, "I would say that for the most part, if we seek an indictment in the case, there is about a 95 percent chance that you are going to ultimately be convicted."

In discussing his situation, Bond states that he has "criminally negligent homicide" on his record, and that he has to "deal with the situation for [four] years of being incarcerated." Bond also somberly discusses how he has to "deal with" the fact that he killed his friend who had "a real bright future." Sauder tearfully remembers her friend, discussing her favorite music and a sweater that she once owned.

The second segment features Wade Collins, who is introduced with the word "Manslaughter" displayed under his name on the screen. Collins discusses a drag race in which he killed a woman in a car that was not involved in the race. The other driver in the race, Jason Jacono, also discusses the collision and the severe injuries that he suffered as a result. A state trooper discusses the severity of the crash and the manner by which the state police investigate such crashes generally, stating, "Any scene we respond to, we treat

13

it as it is. In our opinion it's, it's like homicide, it's a murder investigation until all of the elements are there."

At this point in the video, a Delaware judge appears and states, "The court is beginning to treat . . . juveniles the same as adults when it comes to death or serious physical injury caused by gross reckless driving, or driving while under the influence . . . ." The judge then says, "[T]he only message people truly understand is the punishment in those type[s] of cases. . . .That . . . is the clearest message that the courts can send, . . . to the public, is to look at the sentences imposed upon these individuals . . . ." The judge adds, "[P]eople who get behind the wheel while they're drinking are people, a lot of them read the newspaper, understand the particular punishment and I think the punishment in this area has more deterrence in punishment for a lot of other crimes." The video then shows Collins talking about the "nightmare" of being incarcerated.

The third segment features a man, Tom Golden, sitting next to his fiancé, Lauri Hanulik, who is in a hospital bed. Hanulik's name is placed on the screen with the words "Permanently Brain Damaged" printed below. Hanulik's eyes are open, but she appears to be in a comatose state. Golden explains that he had warned Hanulik that her drinking and driving would result in her death, but that she continued to drink and drive and that she was involved in an alcohol-related crash from which she became permanently brain damaged. Golden describes in graphic detail Hanulik's current physical state and the medical treatment that she receives in order to keep her alive.

14

A fourth segment discusses the aftermath of a crash in which the driver was driving between 90 and 95 miles per hour and four of five people in the speeding car were killed. The mother of one of the dead victims tearfully discusses going to the hospital and finding out that her daughter had been killed. A father discusses the loss of his son. The driver appears on the screen with the word "Manslaughter" below his name. The driver discusses the mental anguish that he feels, knowing that he is responsible for his friends' deaths. A state trooper discusses the psychological trauma that both the perpetrators and the families of victims of drunk driving crashes suffer.

Near the end of the video, Sauder discusses riding in cars with people who have been drinking. She says, "[T]he people in your car, they trust you with their life. I mean I trusted someone with my life and I almost lost it." Bond then talks about how those watching the video may dismiss it as just a "movie about a kid that messed up." Bond closes by stating, "[If] you get in that car and you've had a drink, one drink, and someone hits you, and there's a fatality or there's an injury, you're at fault and you're exactly where I am. And it can happen. It has happened. I'm proof."

        c.        *Defense counsel's renewed objection to the MAAC Video*

At the conclusion of the playing of the video, outside the presence of the jury, defense counsel renewed his objection to the video, stating, "I objected to this back in motions in limine . . . [and] the Court ruled, over my objection, that it was admissible. I think . . . that's a major problem. I think it's going to be grounds for reversal." Defense counsel argued that the video contained "misstatements of law throughout that video."

15

For example, counsel noted that one of the defendants on the video indicated that he would be incarcerated for four years for committing an alcohol-related driving homicide. Counsel argued that such a statement would "leave this jury with the impression that their decision really doesn't make that big of a difference, look, all he's looking at is four years anyway." Counsel also objected to the Delaware prosecutor's statement concerning the extremely high conviction rates for alcohol-related driving offenses in that state and a defense attorney's statement suggesting that defendants who go to trial for alcohol-related driving offenses are likely to be convicted. Defense counsel also objected to the "gross misstatement of the law" made by Bond at the end of the video pertaining to the consequences of being involved in a crash after having just one drink.

The prosecutor responded by stating that she did not think that the video was "overly prejudicial," and that the jury could be "instructed that laws are different from state to state and that their role isn't in the punishment."

After clarifying with the prosecutor that she had not sought admission of either the MAAC Video or the MADD Video at the first trial, the trial court stated that when the People had sought admission of the videos prior to this trial, "they had enough case law to support the position that the videos that the defendant sees in terms of his mental state . . . are . . . admissible." The court also stated, "I wouldn't have ruled differently had I seen the [MAAC] Video" prior to ruling on the People's motion in limine that the

16

MAAC Video could be played for the jury at the trial.[9]  The court further indicated that it would be willing to provide the jury with a curative instruction explaining that the "law is different" in California from the Delaware law described in the video.

After further discussions during which the court agreed that defense counsel had objected, prior to the trial, to the showing of the MAAC Video, defense counsel stated, "I don't think that you can cure it.  I think that it's reversible error."  The court responded that, to the extent defense counsel was making a motion for a mistrial, the court would deny the motion.

        d.     *The curative instruction*

At the next court session, the court addressed the jury, stating:

> "The video you saw last Thursday was shown for a specific purpose. The video was made out of [the] State of Delaware, and did not properly state California law or punishment.  You are ordered to disregard any statement made or identifying titles used concerning what the participants in the video were charged with or the punishment imposed, or what the law in Delaware is concerning drinking and driving and causing injury or death.
>
> "And you are further ordered to disregard any statements by the judge, prosecutor and defense attorney in the video concerning what happens to individuals charged with drinking and driving offenses in Delaware.  You may not for any reason at all discuss or consider these issues during your deliberations, or let them influence your decision in any way."

---

[9]    The trial court also stated, "I didn't recall seeing this video . . . . But I would have allowed it."

e.   *The trial court's ruling that the MAAC Video would not be received in evidence*

That same day, the People moved to admit the MAAC Video in evidence. Defense counsel objected. The trial court indicated that it would consider the issue at a later time.

Later that day, outside the presence of the jury, the trial court held a further hearing on the admissibility of the MAAC Video. Defense counsel renewed his objection to the admission of the video pursuant to Evidence Code section 352. Defense counsel added that the court had given the curative instruction over defense counsel's objection and that the instruction was not sufficient to cure the prejudice caused by the jury having viewed the MAAC Video. Defense counsel argued that the video should not be admitted in evidence for the additional reason that if it were admitted, the jury would be "free to view it in their deliberations."

The prosecutor reiterated that the MAAC Video was relevant to show Diaz's "knowledge of the dangers of drinking and driving." The prosecutor also noted that the jury would be instructed at the close of the case that punishment is "not their purview."

The court expressed concern that if it were to admit the video in evidence, the jury could view the video again during deliberations, stating:

> "My problem with allowing them to see the movie again is that it did
> have a specific purpose, and that was to show—at least arguably—the
> intent and knowledge of the defendant. That's fine. The rest of the
> [video] and why I gave the curative instruction I do think falls within
> the realm of [Evidence Code] section 352; that it is much more
> prejudicial than it is probative. Because it brings up a lot of issues
> that are not part and parcel with knowledge, but it brings up a lot of
> issues of what happens in Delaware versus what happens in

18

California. The down side of receiving it is that the jury has a right to request to see it again. The down side of not receiving it is almost minimal, because then it is categorized as demonstrative only. They've see it once, they won't have a chance to see it again. And my inclination is not to allow them to see this again. So I am going to, with defense objection, sustain that. We're not receiving [the MAAC Video]. It's demonstrative only."

The prosecutor responded in part:

"Your honor, if I may, if it was demonstrative only, then it should not have been shown to the jury at all. They've seen this. It's a piece of evidence that was marked. The People laid the foundation for it. And this goes to the heart of this case, which is what the defendant knew."

The prosecutor and the court then engaged in a lengthy discussion of whether the court's ruling precluded the prosecutor from discussing the video during closing argument. The court stated that the prosecutor would not be precluded from referring to the video during closing argument. The court also clarified that it had provided the curative instruction over defense counsel's objection.

f.    *The MADD Video*

Later during the trial, the People played the MAAD Video. The video was shown without sound because the people who appear in the video speak in Spanish.[10] As the prosecutor played the video for the jury, an interpreter read the jury a transcript of the video in English. The court also provided the jury with transcripts of the video in both English and Spanish.

---

[10]    Prior to the showing of the MADD Video, defense counsel renewed his objection to the video. The trial court overruled the objection and ruled that the video could be played and would be received in evidence.

The MADD Video is approximately 33 minutes long and features two individuals, each of whom had a son who was killed in an alcohol-related crash.  In the first segment, a mother discusses her son's death in a drunk driving crash and the impact that his death had on her and the rest of the family.  The mother is somber and cries through portions of the video.  She begins by describing her son, saying "he liked jokes," "he liked to laugh," and "he was the happiest one in the family."  The mother describes feeling "paralyzed" upon being told that her son had been killed, and how the man who informed her of her son's death gave her the son's crucifix and wallet.  She describes "begg[ing]" a woman at the mortuary to allow her to put different clothes on her son's body, and having her request denied:

> "[W]hen he was born, when I took him home from the hospital, I
> changed him, and now that I wasn't going to have him, it was going
> to be the last time I would see him.  I wanted to change him. And
> they told me no."

The woman also explains that the drunk driver of the truck in which her son was killed was her son's friend:

> "That's why it was hard to accept that a friend could take the lives of
>  . . . friends like that.  To say, 'Let's go, I'll drive.'  Friends should
> protect one another . . . .  He will never know the pain we had."

The segment closes with the mother discussing the impact of her son's death on the rest of her family, explaining "Gabriel [her son] wasn't the only victim; there were a lot of us."  She closes by stating, "[O]ur lives will never be the same."  The video contains

20

photographs of the victim taken throughout his life, as well as a photograph of his grave marker.

The MADD Video also features a father who lost "his only son" to a drunk driver. The father reminisces about his son as a young boy and describes visiting his son in the hospital after the crash:

> "At first if I grabbed his hands, he would sometimes squeeze my hand. But doctors told me it was possible he was responding to me, or it was possible that it was just his muscles doing that without it having anything to do with his feelings. But I'll never, never know that."

The father also discusses the procedures and decisions made regarding his son's medical treatment, as well the family's decision to terminate life support. He speaks emotionally about the pain that he felt and the impact that his son's death had on his family and friends. The father's demeanor is somber throughout the video, and tearful at times.

2.    *Standard of review*

We review for an abuse of discretion the trial court's decision to permit the jury to view the videos. (See, e.g., *People v. Guerra* (2006) 37 Cal.4th 1067, 1113 [abuse of discretion standard of review applies to any ruling by a trial court on the admissibility of evidence and is particularly appropriate for questions regarding relevance and undue prejudice].)

A proper exercise of discretion is " 'neither arbitrary nor capricious, but is an impartial discretion, guided and controlled by fixed legal principles, to be exercised in conformity with the spirit of the law, and in a manner to subserve and not to impede or defeat the ends of substantial justice.' " (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977.) Exercises of discretion must be " 'grounded in reasoned judgment and guided by legal principles and legal policies appropriate to the particular matter at issue.' " (*Ibid.*) Thus, although the abuse of discretion standard is deferential, "it is not empty." (*People v. Williams* (1998) 17 Cal.4th 148, 162.) The standard "asks in substance whether the ruling in question 'falls outside the bounds of reason' under the applicable law and the relevant facts." (*Ibid.*)

3. *Governing law*

a. *Evidence Code section 352*

Diaz objected to the admission of both videos pursuant to Evidence Code section 352. Evidence Code section 352 provides:

> "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

"The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

22

" '[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' " (*People v. Doolin* (2009) 45 Cal.4th 390, 439.)

> b. *The admissibility of evidence to prove a defendant's awareness of the dangers of drinking and driving in establishing implied malice murder*

"California has followed the rule in vehicular homicide cases that 'when the conduct in question can be characterized as a wanton disregard for life, and the facts demonstrate a subjective awareness of the risk created, malice may be implied . . . .' (*People v. Watson* (1981) 30 Cal.3d 290, 298.)" (*People v. Ortiz* (2003) 109 Cal.App.4th 104, 110 (*Ortiz*).) California courts have also held on numerous occasions that, in proving implied malice, an accused's "[p]rior convictions [for driving under the influence] and exposure to mandatory educational programs are admissible to show the accused's awareness of the life threatening risks of driving under the influence." (*People v. David* (1991) 230 Cal.App.3d 1109, 1115; see e.g., *Ortiz*, *supra*, at pp. 112-113 [collecting numerous cases].)

In *Murray*, *supra*, 225 Cal.App.3d at page 737, the defendant was convicted of four counts of murder after killing four people in a head-on collision while driving under the influence of alcohol. The *Murray* court noted that the People presented the following

23

evidence related to the content of a mandatory alcohol education course that the defendant

had attended as a result of a prior conviction for "alcohol-related reckless driving":

> "Charles Lemke, a deputy sheriff, taught the alcohol education classes in appellant's 1983 traffic school.  In his 10 hours of lessons, Lemke covered legal aspects of driving under the influence, historical and contemporary use of alcohol, and the long-term effects of alcohol on organs of the body.  He taught that even small amounts of alcohol could impair the nervous system, the muscles, and the brain and lead to problems of judgment and lack of coordination.  He taught that alcohol impairs the ability to make rational decisions and to judge distance and speed.  He taught that alcohol reduces inhibitions and causes drivers to take abnormal chances, such as speeding and dodging in and out of traffic.  He used films which demonstrated how driving performance declines as the blood-alcohol level increases, showed actual accidents involving drunk driving, and displayed the effect of alcohol on the brain.  He used charts and curves demonstrating the number of drinks which average persons of different weights would require to reach prohibited blood-alcohol percentages, and he taught that beer has the same effects as liquor and wine."  (*Id.* at p. 739.)

In concluding that the "trial court properly admitted evidence that in connection

with appellant's three prior convictions of drunk driving and alcohol-related reckless

driving, appellant completed mandatory education programs on the dangers of drunk

driving," the *Murray* court reasoned that several courts had "held such evidence is relevant

to show the accused's awareness of the life-threatening risks of drunk driving."  (*Murray*,

*supra*, 225 Cal.App.3d at pp. 744-745.)  The *Murray* court also relied on evidence of the

defendant's prior alcohol-related driving convictions and attendance at mandatory alcohol

education programs in concluding that the People had presented sufficient evidence of

implied malice to support the murder convictions.  (*Id*. at p. 748.)

24

4. *The trial court erred in permitting the jury to view both the MAAC Video and the MADD Video*

As an initial matter, the trial court should have viewed the videos prior to ruling that the People would be permitted to play them for the jury at trial. (See *People v. Holford* (2012) 203 Cal.App.4th 155, 174 (*Holford*) ["Defendant criticizes the trial court for not reviewing the video before making its [Evidence Code] section 352 ruling. We do not condone this practice. The trial court should have reviewed the video before ruling on its admissibility"].) As the *Holford* court explained, "The nature of discretion requires that the court's decision be an informed one and not ' "a shot in the dark." ' " (*Ibid.*) While the People correctly note that the trial court stated that it had reviewed the transcripts of the videos prior to ruling that the videos could be shown at trial, a review of the transcripts should have alerted the court of the need to view the videos, in light of the potential for prejudice that the content of the transcripts conveys.[11] Viewing the videos, in turn, would have permitted to the court to assess the potentially extremely prejudicial impact of the videos—an impact that one cannot fully appreciate from merely reading the cold transcripts.

---

[11] We emphasize that we do not hold that a trial court necessarily commits reversible error by failing to view a video before ruling that the video may be shown to the jury. (See *Holford*, *supra*, 203 Cal.App.4th at p. 174 [trial court may rely on an offer of proof in considering whether to permit jury to view a video at trial].) Rather, we conclude that in light of the People's offer of proof in this case, which consisted of the actual transcripts of the videos, it was incumbent upon the trial court to view the videos prior to ruling that that they could be shown to the jury, because the transcripts contain many statements that should have alerted the court of the potential for extreme prejudice if the jury were to be shown the videos.

The trial court's decision to permit the jury to view the MAAC Video and the MADD Video permitted the prosecution to present to the jury evidence unlike that which has previously been held to be admissible by any court in California. Despite the numerous vehicular homicide cases in which California courts have upheld the admission of evidence that a defendant participated in an alcohol education program prior to the commission of the charged murder, we are aware of no authority that would provide support for the admission of videos that contain highly emotional footage of victims and their families discussing the impact of alcohol-related crashes, unrelated to the charged offense.

On appeal, the People do not contend that there is any such authority.[12] Rather, the People argue, "The content of the [MAAC and MADD] videos, describing the experiences of both defendants and victims of driving under the influence, are indistinguishable from the [driving under influence] educational programs universally found to be admissible in a case like this." We disagree. The videos at issue in this case contain a large amount of extremely prejudicial material presented in a format uniquely

---

[12]    In the trial court, the prosecutor argued that in *People v. Murray*, *supra*, 225 Cal.App.3d 734, the court held that the "content of videos" shown in a mandatory alcohol education class was admissible to demonstrate a defendant's knowledge of the dangers of drinking and driving. In fact, as described in part III.A.3.b., *ante*, in *Murray* the prosecution presented testimony that generically *described* the types of information provided in the defendant's alcohol education class. (*Id*. at p. 739.) The admissibility of actual videos similar to those shown to the jury in this case is not discussed in the opinion. However, based on the prosecutor's argument, the court was apparently under the misimpression that the *Murray* court had approved the admission of the videos.

likely to elicit precisely the type of prejudice that Evidence Code section 352 is designed to prevent.

To begin with, both videos contain the testimonials of multiple somber and tearful individuals discussing numerous alcohol-related vehicle crashes in which their loved ones were killed. The speakers on the videos describe in vivid detail both the crashes and the impact that the crashes had on them and their families. After having viewed the videos, we can say with near certainty that the jurors in this case would have felt sympathy for the families of the victims of the alcohol-related crashes discussed in the videos.

Allowing the jury to view the videos created a substantial danger of inflaming the jury's passions by engendering similar feelings of sympathy for the victims of the charged offenses and their families. (Cf. *People v. Arias* (1996) 13 Cal.4th 92, 160 ["It is 'settled that an appeal to the jury to view the crime through the eyes of the victim" and "an appeal for sympathy for the victim is out of place during an objective determination of guilt"].) The likelihood of this type of undue prejudice was particularly high in light of the fact that speakers portrayed in both the MADD Video and the MACC Video described alcohol-related traffic fatalities that shared many similarities with the charged offense. In the MADD Video, a mother describes a scenario in which her son went out with a group of friends and the driver, who had been drinking alcohol, crashed the vehicle. Her son, a passenger, was killed in the crash. In the MACC Video, Bond described going to a bar with friends, consuming alcohol at the bar, driving while intoxicated, crashing the vehicle, and injuring one passenger and killing another passenger.

27

The videos contain numerous images that serve to heighten the emotional impact of the videos. The MADD Video contains several images of the deceased victims taken throughout their lives, as well as a grave marker for one of the victims, while the MAAC Video contains multiple photographs of crime scenes that depict severely damaged vehicles, debris and blood spatter, newspaper headlines, and photographs of grave markers. In addition, the MAAC Video contains video footage of a brain damaged woman who was injured in a drunk driving collision, as well as a graphic discussion of the medical procedures that are required in order to keep her alive. These depictions heightened the possibility that the emotions of the jury would be inflamed and would cause the jury to feel scorn and hostility toward Diaz as the perpetrator of an alcohol-related driving offense.

The MAAC Video also contains numerous statements that were entirely irrelevant to the case, and were highly prejudicial in that they suggested to the jury that it would be acting in an aberrant fashion if it were to find Diaz not guilty. For example, on the MAAC Video, both a prosecutor and a defense attorney make statements that suggest that those who are charged with alcohol-related driving offenses are likely to be found guilty.[13] Perhaps even more wrought with the potential for prejudice is footage in the MAAC Video of a judge stating that punishment is the "only message people truly

_____

[13]    The MAAC Video also shows Bond making statements in which he suggests that a person would be guilty of an alcohol-related driving offense after having had a single drink and driving.

28

understand . . . in [these] type[s] of cases," and that "punishment in this area has more deterrence [effect] than punishment for a lot of other crimes." As Diaz argues in his brief, "There simply is no relevance to the conviction rates, defense probabilities and sentences in any case much less those from another jurisdiction." (See e.g., *People v. Honeycutt* (1977) 20 Cal.3d 150, 157, fn. 4 ["A defendant's possible punishment is not, of course, a proper matter for juror consideration"].)

In addition, one of the inmates in the MAAC Video, David Bond, states that he would be incarcerated for four years.[14] Not only is this punishment-related comment entirely irrelevant to proving the charged offense, it was also uniquely likely to cause prejudice in that the statement implicitly suggested that Diaz would be incarcerated for a similar, relatively short, period of time if convicted since Bond, like Diaz, was responsible for an alcohol-related crash in which one of his friends died and a second friend was seriously injured.

In short, the videos are highly inflammatory, appeal to the jurors' sense of sympathy and passion, improperly depict jail conditions and contain discussions of potential sentences, and include statements of law that have no relevance to the case and

---

14      Several inmates on the MAAC Video refer to their incarceration and the conditions of imprisonment, while depicted in prison garb in penal institutions with captions stating the offenses for which they had been convicted. As noted above, punishment is not a proper consideration for the jury. (See e.g., *People v. Honeycutt*, *supra*, 20 Cal.3d at p. 156, fn. 3.)

that were likely to mislead the jury.[15]  While the videos may have had probative value in demonstrating Diaz's awareness of the dangers of drinking and driving in proving implied malice, the People had ample other evidence that would have established this element and that would not have presented the substantial risk of severe prejudice that allowing the jury to view the videos did.  In addition to evidence of Diaz's extreme intoxication and reckless driving, such evidence included certified court records showing Diaz's two prior convictions for alcohol-related driving offenses, documents from the prior convictions on which Diaz acknowledged the dangers of drunk driving, other evidence of Diaz's participation in alcohol education programs, and Alvarez's and Martinez's testimony that they attempted to dissuade Diaz from driving and repeatedly asked Diaz to slow down. (See pt. II., *ante*.)

Having the jury view the highly inflammatory content of the two videos for the purpose of establishing Diaz's knowledge of the dangers of drinking and driving exposed the jury to evidence that would otherwise be patently and indisputably inadmissible. Given the near certain potential for undue prejudice and the marginal legitimate probative value of the videos, the trial court should have exercised its discretion in the only

---

15    While perhaps it cannot be said that the videos necessitated an "undue consumption of time" (Evid. Code, § 352), they were approximately an hour in combined length. and thus were far from "brief and fleeting."  (*People v. Brown* (2003) 31 Cal.4th 518, 554.)

reasonable manner, and ruled the videos inadmissible.[16] While we are cognizant that it is the rare case in which a trial court's evidentiary rulings are determined to be erroneous, for the reasons stated above, we conclude that this is such a case. (See *People v. Lang* (1989) 49 Cal.3d 991, 1050 [observing that the abuse of discretion standard of review in the evidentiary context "calls for deference—but it does not, and cannot, require abdication"].)

Accordingly, we conclude that the trial court erred in permitting the jury to view the videos.

5. *The error requires reversal*

a. *Standard of prejudice*

Diaz claims that permitting the jury to view the videos violated his due process right to a fair trial and thus, that the *Chapman* standard of prejudice applies. (See *Chapman v. California* (1967) 386 U.S. 18, 24 ["before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"].) The People argue that the *Watson*[17] standard of prejudice applies because the mere erroneous exercise of discretion under the ordinary rules of evidence generally does not implicate the federal constitution. (See, e.g., *People v. Samuels* (2005)

---

16     As noted previously, after viewing the MAAC Video at trial, the trial court expressly concluded that the jury should *not* view the video again and expressed concern that the video "falls within the realm of [Evidence Code section] 352."

17     *People v. Watson* (1956) 46 Cal.2d 818.

36 Cal.4th 96, 114.) Under *Watson*, the reviewing court must affirm the judgment if it is "not reasonably probable that a result more favorable to defendant would have been reached in the absence of the error. . . ." (*Watson*, *supra*, 46 Cal.2d at p. 837.)

We assume for purposes of this decision that the trial court's error did not rise to the level of a federal constitutional violation because it is clear that even under the more lenient *Watson* standard, reversal is required.

        b.     *Application*

As noted above, the videos were extremely likely to inflame the jury's passions against Diaz. While the trial court provided a curative instruction after the jury viewed the MAAC Video in an attempt to lessen the prejudice from having exposed the jury to irrelevant "statements by the judge, prosecutor, and defense attorney in the video concerning what happens to individuals charged with drinking and driving offenses in Delaware," the instruction was inadequate. To begin with, the primary point of the MAAC Video was, in fact, to illustrate "what happens to individuals charged with drinking and driving offense in Delaware." Thus, the trial court's curative instruction was an attempt to unring not just a bell, but an entire carillon.[18] (See *People v. Hill* (1998) 17 Cal.4th 800, 845-846 [" 'It has been truly said: "You can't unring a bell." ' [Citation.] Here, the jury heard not just a bell, but a constant clang"].) In addition, the trial court's

---

[18]     "A carillon is a musical instrument that is typically housed in the bell tower (belfry) of a church or other municipal building. The instrument consists of at least 23 cast bronze, cup-shaped bells, which are serially played to produce a melody, or sounded together to play a chord." (<http://en.wikipedia.org/wiki/Carillon> [as of Jun. 24, 2014].)

curative instruction did not address the substantial danger that the jury's passions would be inflamed by showing emotional testimonials of the families of victims of alcohol-related driving offenses that were similar to the charged offense. The trial court's subsequent refusal to admit the MAAC Video in evidence did not, and could not, eliminate the prejudice caused by having shown the video to the jury. As the prosecutor stated in arguing for the MAAC Video's admission, "[I]t should not have been shown to the jury at all," if the court was unwilling to admit the MAAC Video in evidence.[19]

Compounding the prejudice caused by allowing the jury to view the videos, the prosecutor referred to the videos *five* times during closing argument. The prosecutor read quotations of statements made in both videos, and even referred to statements made by the Delaware prosecutor and judge in the video despite the court's instruction to the jury that it should disregard those statements.[20] A prosecutor's reference to evidence that should not have been presented to the jury increases the potential for prejudice flowing from the

---

[19]    The trial court's ruling that the MAAC Video was "demonstrative evidence" was error, as well. Demonstrative evidence is evidence that is shown to the jury "as a tool to aid the jury in understanding the substantive evidence." (*People v. Duenas* (2012) 55 Cal.4th 1, 25.) The MAAC Video clearly had no relevance as a tool in helping the jury understand the substantive evidence presented in the case.

[20]    The following colloquy occurred during closing argument:
    "[The prosecutor]: [Diaz] was warned in that video by the person who was accused by the sister, by the district attorney, the judge, the prosecutor.
    "[Defense counsel]: Your honor, I object to that. The Court specifically admonished the jury to disregard the statements in the video by the judge, the prosecution, and defense attorney.
    "[The court]: I did. That is why I read you that admonishment."

33

error. (See, e.g., *People v. Cruz* (1964) 61 Cal.2d 861, 868 ["There is no reason why we should treat this evidence as any less 'crucial' than the prosecutor—and so presumably the jury—treated it"]; compare with *People v. Gonzales* (2013) 56 Cal.4th 353, 391 [concluding erroneous admission of evidence was harmless where "in his closing argument, the district attorney did not emphasize the evidence affected by the trial court error"].)

The record also contains several additional indicia of prejudice caused by the showing of the videos. During deliberations, the jury asked two questions about "manslaughter," a charge that was not presented in the case, and that was mentioned only in the MAAC Video. These questions suggest that the jury discussed the MAAC Video during deliberations, as the prosecutor acknowledged in the trial court while discussing with the court and defense counsel how the court should respond to one of the jury's questions:

> "The concern is the fact that they are bring[ing] up or talking about stuff that is not in evidence in this case . . . . Because they are obviously talking about manslaughter, which is not in evidence or any charge in this case. They have one charge. . . . Because . . . the issue of manslaughter, I mean, that came up only in the [MAAC] [V]ideo, which the Court instructed them not to consider. . . ."

Further, the record unequivocally indicates that the jury viewed this as a close case. The jury asked for a read back of both Alvarez's testimony and closing arguments, asked two questions concerning the meaning of implied malice, deliberated for a lengthy period

34

of time, and reported itself deadlocked on more than one occasion.[21] (See *People v. West* (1983) 139 Cal.App.3d 606, 610 ["The closeness of this case is demonstrated by the fact that the jury asked for rereading of a substantial portion of the testimony, asked for a rereading of some instructions and at one point reported itself deadlocked"].) In addition, one juror requested to be excused because he or she had "doubt," and two other jurors sent notes to the trial court indicating that several jurors were unwilling to find Diaz guilty of murder.[22] These manifestations of the closeness of the case in the jury's eyes establish that Diaz may have obtained a more favorable result but for the trial court's error in allowing the jury to view the videos. (See *People v. Soojian* (2010) 190 Cal.App.4th 491, 520 ["[U]nder the *Watson* standard a hung jury is considered a more favorable result than a guilty verdict."].)

Finally, the previous trial resulted in a hung jury on the murder charge. This, too, supports a finding of prejudice in light of the fact that the evidence presented at both trials was similar, with the significant exception that the videos were *not* shown at the first trial. (See, e.g., *People v. Kelley* (1967) 66 Cal.2d 232, 245 ["Not only is the prejudicial nature

---

[21]    After a substantial period of deliberations, the jury foreperson reported to the court that the jury was deadlocked, "Nine, two and one."

[22]    One jury note stated,"3 jurors will not find conviction of murder but believe the prosecution has met the burden of proof for implied malice. 2 jurors say the charge should be manslaughter. I think these 3 jurors have misrepresented themselves to the court." Another jury note stated in relevant part, "It is my opinion that unfortunately one of the reasons why this jury is at an impass[e] is because some of the jurors feel that the charge is excessive (i.e. Murder vs. Manslaughter)."

of the erroneously admitted evidence obvious, but it is also the fact that at the first trial when such evidence was excluded the jury was unable to agree but at this trial when the evidence was admitted a unanimous verdict resulted. The two trials being otherwise substantially similar, such fact demonstrates almost to a certainty the prejudicial nature of the error."].)

We acknowledge, as the People argue in their brief, that the prosecution presented strong evidence of Diaz's guilt. Not only did the People present overwhelming evidence that Diaz drove extremely recklessly while having a very high blood alcohol level, the People presented considerable other evidence, apart from the videos, that Diaz harbored implied malice. (See pt. III.A.4., *ante*.) However, in light of the overwhelming indicia of prejudice discussed above, we conclude that it is reasonably probable that Diaz would have received a more favorable result but for the trial court's error.

Under these circumstances, we are compelled to reverse the judgment. (*Watson*, *supra,* 46 Cal.2d at p. 837.)

B.     *Diaz's convictions on counts 3 and 4 are not precluded as lesser included offenses to count 2*

Diaz contends that his convictions for driving under the influence causing injury (§ 23153, subd. (a)) (count 3) and driving with a measurable blood alcohol causing injury (§ 23153, subd. (b)) (count 4) must be reversed because they are lesser included offenses of gross vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (a)) (count 2). (Citing *People v. Miranda* (1994) 21 Cal.App.4th 1464, 1466-1467 [concluding

36

driving under the influence causing injury (§ 23153, subd. (a)) is a necessarily included

offense of gross vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (a)].)

The People contend that Diaz's convictions are proper because counts 3 and 4 were

based on injuries that Diaz caused to *Alvarez*, while Diaz's conviction on count 2 was

premised on Diaz's act in causing the death of *Sanchez*.

In *People v. McFarland* (1989) 47 Cal.3d 798 (*McFarland*), a defendant was

convicted of vehicular manslaughter with gross negligence (former Pen. Code, § 192,

subd. (c)(3)) and two counts of causing bodily injury while driving under the influence of

alcohol (§ 23153, subd. (a)) based on a crash in which one person was killed and two

others were injured. (*McFarland*, *supra*, 47 Cal.3d at pp. 800-801.) The Supreme Court

rejected the defendant's argument that Penal Code section 654 precluded punishing the

defendant for both the manslaughter and the drunk driving charges:

> " '*A defendant may properly be convicted of multiple counts for
> multiple victims of a single criminal act . . .* where the act prohibited
> by the statute is centrally an "*act of violence* against the person.' " '
> [Citations.] Plainly, vehicular manslaughter with gross negligence
> constitutes a crime of violence against the person. [Citation] [¶]
> Thus, we are satisfied that where, as here, *a defendant commits
> vehicular manslaughter with gross negligence—an act of violence
> against the person—he may properly be punished for injury to a
> separate individual that results from the same incident*."
> (*McFarland*, *supra*, 47 Cal.3d at pp. 803-804, italics added.)

Under the rationale of *McFarland*, Diaz could properly be convicted of, and even

punished for, both committing gross vehicular manslaughter while intoxicated (§ 191.5,

subd. (a)) and causing bodily injury while driving under the influence of alcohol (§ 23153,

subd. (a)) and with an elevated blood alcohol level (§ 23153, subd. (b)) (causing bodily injury offenses), as long as the offense of gross vehicular manslaughter while intoxicated and the causing bodily injury offenses involved separate victims.

The People presented evidence that Diaz committed manslaughter as to Sanchez and also caused bodily injury to Alvarez. As Diaz notes in his brief, Alvarez "remained a partial quadriplegic" as a result of the crash, and "Sanchez died due to . . . injuries caused by the accident."[23]

Accordingly, we conclude that Diaz is not entitled to reversal of his convictions on counts 3 and 4 under the theory that the offenses charged in these counts are lesser included offenses of count 2, because the People presented evidence that Diaz caused the death of one victim and caused injury to a separate victim.

IV.

DISPOSITION

Diaz's conviction on count 1, for murder, is reversed and his sentence is vacated. Diaz's convictions on counts 2 through 5 are affirmed.

---

[23]    In his reply brief, Diaz appears to suggest that because the amended information did not allege that Alvarez was the victim with respect to counts 3 and 4, Diaz may not be convicted of both count 2 and counts 3 and 4. We are aware of no authority, and Diaz cites none, that required the People to allege that counts 3 and 4 involved a different victim from the victim of the offense charged in count 2.

38

The People may retry Diaz on a charge of murder within the time limit set forth in Penal Code section 1382 (i.e., 60 days after the filing of the remittitur unless good cause is shown for a different period or Diaz waives the 60-day requirement). If Diaz is retried and found guilty of murder, the trial court shall resentence Diaz on the murder conviction and counts 2 through 5. If Diaz is found not guilty of murder, the trial court shall resentence Diaz on counts 2 through 5.

In the event that the People elect not to retry Diaz on a charge of murder, the trial court shall resentence Diaz on counts 2 through 5. The trial court may conduct any necessary ancillary proceedings consistent with this opinion.

AARON, J.

WE CONCUR:

NARES, Acting P. J.

McINTYRE, J.

39