CORRIGAN, J.,
Concurring.—I concur in the majority opinion but write separately to address the observations put forward in the concurring opinion of my colleague. The separate opinion emphasizes the “relevance” of the fact that two previous juries were unable to reach a verdict without the bite mark *316 evidence. (Cone. opn. of Liu, J., post, at p. 320.) To conclude that the case is weak merely because a jury, or even two, did not return a verdict is often an exercise in speculation.
Our role as a reviewing court is to determine whether the false evidence admitted in this case was “ ‘material,’ ” a standard equivalent to the “reasonably probable test for state law error” under People v. Watson (1956) 46 Cal.2d 818 [299 P.2d 243]. (Maj. opn., ante, at pp. 312-313.) Under that standard, we must “examine ‘each individual case to determine whether prejudice actually occurred in light of the entire record: ” (Cassini v. Allstate Ins. Co. (2004) 33 Cal.4th 780, 801-802 [16 Cal.Rptr.3d 374, 94 P.3d 513], italics added.) Prejudice must appear as a “ ‘demonstrable reality,’ not simply speculation.” (People v. Williams (1988) 44 Cal.3d 883, 937 [245 Cal.Rptr. 336, 751 P.2d 395].) The majority opinion aptly identifies several facts in the record that show a reasonable probability defendant suffered prejudice from admission of the bite mark evidence. (Maj. opn., ante, at pp. 313-315.)
By contrast, it is very difficult to read any significance into the fact that two other juries hung in this case. Juries fail to agree for a variety of reasons and the rules of evidence prohibit inquiry into the jurors’ subjective reasoning process. (Evid. Code, § 1150, subd. (a).) Particularly when the split is 11 to one, as it was in the second trial here, the disagreement may be driven as much by the personality of a juror, a uniquely held world view, or even some friction during deliberations, as by any weakness in the underlying case. The point is that, in most cases, a reviewing court, writing at a great remove from trial proceedings, may seldom know why a jury did not reach consensus. Such is the case here.
My colleague accepts defendant’s assertion that “ ‘the difference between the first two unsuccessful trials and the third trial was the introduction of bite mark evidence through Dr. Sperber.’ ” (Cone. opn. of Liu, J., post, at p. 321.) However, complete records of the first two trials are not before us, and the record that we do have shows the assertion is inaccurate, to say the least. Defendant testified in his own defense in the first two trials. He did not do so here. Of course, the last jury could not draw any negative inference from his failure to testify and there is nothing in this record to indicate why that choice was made. The fact remains that, in the first two trials, those juries received different evidence, and heard it from defendant himself. The availability of that testimony may have swayed some dissenting jurors in his favor.
*317 In addition, the minute orders from the first two trials were made a part of this habeas corpus petition record.[1] A comparison of all three sets of minute orders reveals that there were a total of 37 witnesses called at all three trials, 21 on behalf of the prosecution and 16 called exclusively by the defense. But only 12 of these witnesses testified at all three trials, 10 for the prosecution and two for the defense. In terms of prosecution witnesses, Robert Fenstermacher, Buster Price, Alvera Price, and Marie Starg testified only at the first trial; Kathy Sue Blades and Rosalin Scamihorn only at the second. Hobart Gray, Valerie Seleska, and Dr. Norman Sperber were called only in the last trial. Craig Ogino did not testify at the first trial but did at the second and third. For the defense, Mike Au, Pedro Galvan, Michael Stansell, and Allen Walkner testified only at the first trial; Tom Bradford and Norman Parent only at the second.[2] Christian Filipiak, Robert Gager, Dr. Gregory Golden, Wayne Kozica, Gregory Randolph, Jean Paul Rios, and Dr. Griffith Thomas were never heard by the two hung juries, testifying only at trial three. As noted, defendant testified only at the first two trials.
Although the substance of the testimony at the first two trials is not available for our review, it is clear each case was tried with substantially different sets of witnesses. Defendant was represented by the public defender in the first two trials, and by privately retained counsel in the third. One judge presided over the first trial, and a different judge presided over the second and third. We cannot know whether there were significant differences in eviden-tiary rulings made in each case. We cannot know how the first two cases were argued by different counsel or whether the theory or nuances of those cases differed from either the prosecution or defense perspective.
I do not suggest that we can conclude that those differences, and others that may have flowed from them, influenced the outcome here. The pivotal point is that we do not know. I strongly urge that we cannot and should not speculate about the import of the fact that two other juries failed to reach consensus, particularly when so many factors can lead to such a result, and when the trials were so demonstrably different.
My colleague asserts that we “do know” the prosecution here “never meaningfully disputed Richards’s observation that the bite mark evidence was a material difference” among the trials. (Cone. opn. of Liu, J., post, at p. 321.) First, as noted, that is simply not the case as to the main evidentiary difference. Second, it misstates the People’s position.
*318 In their return to the habeas corpus petition, the People affirmatively “deny each and every allegation of the Petition,” except as stated otherwise. In the briefing at issue here the focus was always the bite mark evidence. The People properly concentrated their argument on that question. They had no reason to wander far afield, arguing at length about the strength of cases not under review. As the People point out in their briefing, this petition rests solely on a statutory change. They clearly state their position that “[t]he only relevant analysis is whether the changes to Penal Code [section] 1473 require relief here.” In their return the People refer to the great body of evidence they assert points to defendant’s guilt, and note that that evidence relates to other aspects of the case that have been “repeatedly parsed throughout numerous appeals and petitions.” It is a substantial overreach to suggest the People concede a point they explicitly deny, particularly to imply they acknowledge weakness in a case they have strongly pursued for over 20 years.
My colleague cites other cases in which the fact of prior hung juries was recognized as “relevan[t].” (Conc. opn. of Liu, J., post, at p. 320.) People v. Gonzalez (2006) 38 Cal.4th 932 [44 Cal.Rptr.3d 237, 135 P.3d 649] was a death penalty case in which the first jury convicted the defendant of multiple murders but hung on the penalty question. A second jury returned a death verdict. (Id, at p. 938.) The court held that the prosecution improperly failed to provide discovery of rebuttal evidence in the second penalty trial, prejudicing the defendant. (Id, at pp. 955, 957, 961-962.) The court’s discussion reveals that it was able to compare the evidence from the first and second penalty trials in a number of particulars. The same counsel participated in both penalty phases, which were apparently tried before the same judge. (Id. at pp. 961-962.) In reversing, we observed that “a death verdict was not a foregone conclusion. Indeed, the first penalty trial ended with a hung jury.” (Id. at p. 962.) Of course, a death verdict is never a “foregone conclusion” because the penalty decision is normative. Even if all jurors agree that the evidence shows the aggravating circumstances outweigh the mitigating, they remain free to return a verdict for a life sentence if they conclude death is not appropriate. (People v. Page (2008) 44 Cal.4th 1, 55-56 [79 Cal.Rptr.3d 4, 186 P.3d 395].) The observation that a death sentence was not a foregone conclusion does little to support an argument that a prior hung jury in the guilt phase is strong evidence of a weak factual case.
In People v. Kelley (1967) 66 Cal.2d 232 [57 Cal.Rptr. 363, 424 P.2d 947], we found the trial court erred in admitting evidence of the defendant’s unlawfully obtained confessions to uncharged sexual acts as circumstantial proof that he committed the charged offenses. (Id, at pp. 236-251.) In assessing prejudice, we noted “that at the first trial when such evidence was excluded the jury was unable to agree but at this trial when the evidence was admitted a unanimous verdict resulted.” (Id, at p. 245.) We found this fact relevant given that the two trials were “otherwise substantially similar.” *319 (Ibid.; accord, People v. Diaz (2014) 227 Cal.App.4th 362, 385 [173 Cal.Rptr.3d 594].) As noted, defendant has failed to make such a showing here.
Kyles v. Whitley (1995) 514 U.S. 419 [131 L.Ed.2d 490, 115 S.Ct. 1555] was also a death penalty case. There the original jury hung as to guilt and a second jury convicted and returned a death judgment. (Id. at p. 421.) The case was reversed for significant Brady violations (Brady v. Maryland (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194]). (Kyles, at pp. 441-454.) The court had before it an extensive evidentiary record, produced in connection with habeas corpus review, allowing a comparison of the evidence presented and the theories relied upon in each trial. (Id. at pp. 429M-31.) Justice Stevens wrote separately in response to a four-justice dissent. Even Justice Stevens’s opinion, joined in by two other justices, cannot be fairly said to support a reliable conclusion that a hung jury means the factual case is weak. (Id. at p. 455 (cone. opn. of Stevens, J.).) Indeed, as the majority noted, “Because the State withheld evidence, its case was much stronger, and the defense case much weaker, than the full facts would have suggested.” (Id. at p. 429, italics added.) Justice Stevens’s concurrence merely relied on the previous hung jury as one factor in concluding the Brady errors were prejudicial. (Id. at p. 455 (cone. opn. of Stevens, J.).)
My colleague also cites cases from federal courts of review and the states of Georgia and Massachusetts. Those cases are not binding precedent, and my colleague does not suggest otherwise. It appears that in most of those cases the courts had far more complete records of all proceedings involved. They did not draw speculative conclusions as to the strength of a case from the mere fact of a hung jury.[3]
I am not suggesting that a full record can never provide sufficient evidence for a reviewing court to make a proper evaluation of the strength of cases as presented. I do counsel that courts should be hesitant to label a case weak due to a hung jury in a previous case, the record of which is not before them.

 There was actually an additional trial which was begun after the first mistrial. That case was mistried because the trial judge recused herself during voir dire. (In re Richards (2012) 55 Cal.4th 948, 955 [150 Cal.Rptr.3d 84, 289 P.3d 860].) In discussing the three trials here, I refer to the three times the case was given to a jury to decide.

 Bradford and Parent also testified for the prosecution in all three trials.

 The exception is Commonwealth v. Broomhead (2006) 67 Mass.App.Ct. 547 [855 N.E.2d 413], a driving under the influence case. The court reversed for violation of a state rule of criminal procedure. (Id. at p. 417.) There the court did conclude the case was a close one, because two previous juries had hung and the final jury had sent out a note asking what would happen if it could not agree on a verdict. (Id. at p. 420.) The case does not reveal how the previous juries were divided, nor does it discuss the possible differences in evidence or theories presented. The paucity of information makes it difficult to evaluate whatever persuasive value the case may have.