Filed 9/4/15  P. v. Duclos CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D065591 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD246946) |
| McGHEE DUCLOS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Charles G. Rogers, Judge.  Affirmed.

Law Offices of Kurt David Hermansen and Kurt David Hermansen, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Meagan J. Beale, Deputy Attorneys General for Plaintiff and Respondent.

INTRODUCTION

The People charged McGhee Duclos with carjacking (Pen. Code, § 215, subd. (a)) (count 1)[1] and robbery (§ 211) (count 2), and alleged that Duclos used a deadly and dangerous weapon during the commission of both offenses (§ 12022, subd. (b)(1)). The People further alleged that Duclos had suffered one prison prior (§ 667.5, subd. (b)), two serious felony priors (§ 667, subd. (a)(1)), and five strike priors (§ 667, subds. (b)-(i)). During a jury trial, Duclos presented the defense that he was not guilty of the charged offenses because he was legally unconscious while committing the acts comprising the offenses. The jury found Duclos guilty on all counts, and found true the weapon enhancement allegations. The trial court sentenced Duclos to an aggregate term of 36 years to life in prison.

On appeal, Duclos contends that the trial court abused its discretion in excluding certain evidence related to his unconsciousness defense pursuant to Evidence Code section 352, and that the court's ruling violated his constitutional rights to due process and to present a defense. Duclos also claims that the trial court erred in instructing the jury pursuant to the standard CALCRIM instruction on unconsciousness because the instruction purportedly improperly lessened the prosecution's burden of proving every

---

[1]    Unless otherwise specified, all subsequent statutory references are to the Penal Code.

element of the charged offenses beyond a reasonable doubt. Finally, Duclos claims that the trial court erred in failing to exclude from evidence a photograph found on his cell phone after his arrest because the search of the phone was conducted without a warrant. We affirm the judgment.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A.      *The prosecution's evidence*

On an evening in March 2013, Katie Preman drove her Jaguar to a shopping mall. After parking her car, Preman popped open the trunk and got out of the car. Preman realized that she had left $10 on the seat of the car, and she reached down and picked up the money.

Duclos approached Preman with a gun[2] and told her to put her purse down and to place her keys on the driver's seat. Duclos came within one or two feet of Preman. Preman put her purse on the driver's seat. Duclos took the car keys and the $10 from Preman, told her to back away, and got into her car.

Duclos backed up the car and the trunk popped open. Duclos stopped the car, got out, and closed the trunk. Preman screamed at Duclos to return her belongings. Duclos pointed the gun at Preman, got back into the car, and sped off. According to Preman, during the encounter, Duclos appeared "very serious and very organized." Inside the Jaguar were Preman's iPhone, her purse, and a pair of diamond earrings.

---

[2]      Police later determined that the gun was a BB gun.

3

As Duclos drove off, Preman began screaming for help.  A woman heard Preman's screams and called 911.  A responding police officer allowed Preman to use his iPhone to track the location of Preman's iPhone.  Additional police units responded to the location at which Preman's iPhone had been detected.  At that location the officers saw a car matching the description of Preman's Jaguar.

A short time later, a police officer saw Duclos walking away from the Jaguar.  The officer stopped Duclos at gunpoint.  Duclos dropped the iPhone and car key and put his hands in the air.  An officer recovered a BB gun from Duclos's waistband.  Preman later identified Duclos at a curbside lineup.

Police transported Duclos to the police station.  Once there, police searched Duclos and found cash, earrings, and Preman's credit cards and identification.  Police also searched Duclos's cell phone and discovered a photograph of the BB gun that officers had found in Duclos's waistband.

San Diego Police Detective John Smith interrogated Duclos.  Duclos acknowledged having taken Preman's car, and provided several details concerning the incident.  For example, Duclos stated that he obtained the BB gun from his brother's room and had taken a bus to the mall.  According to Smith, Duclos also stated that he saw "the blonde lady in the car, with her purse open, counting money, and he decided to take her car and money."  Smith stated that Duclos's answers were responsive and "made perfect sense."

4

B.	*The defense*

Duclos presented evidence that he committed the acts comprising the offenses while in a dissociative fugue state. (See part III.A.2.e., *post*.) According to a defense expert, a person suffering from a fugue state may commit acts that appear to be purposeful without actually being conscious.

C.	*Rebuttal evidence*

Three women testified that Duclos had robbed each of them during three separate robberies in 2006. In addition, Francisco Ramirez, a former San Diego police officer, testified concerning Duclos's commission of a robbery in 2003. According to Ramirez, during a police interview, Duclos initially denied committing the robbery, but subsequently admitting having robbed the victim after Ramirez told Duclos that witnesses had identified him.

III.

DISCUSSION

A.	*The trial court did not abuse its discretion in limiting the presentation of evidence related to Duclos's unconsciousness defense pursuant to Evidence Code section 352; the court's ruling did not violate Duclos's constitutional rights*

Duclos contends that the trial court abused its discretion in excluding certain evidence of his unconsciousness defense pursuant to Evidence Code section 352. Specifically, Duclos contends that the court abused its discretion in precluding him from presenting testimony concerning recent seizures that he suffered while he was

5

incarcerated, and from showing the jury a video taken prior to trial while he was incarcerated for the charged offenses, during which he appears to be having a seizure.

We review this contention pursuant to the abuse of discretion standard of review. (See *People v. Guerra* (2006) 37 Cal.4th 1067, 1113 [abuse of discretion standard of review applies to any ruling by a trial court concerning the admissibility of evidence and is particularly appropriate for questions concerning Evidence Code section 352].)

Duclos also claims that the trial court's ruling excluding this evidence amounted to a deprivation of his constitutional rights to due process and to present a defense. We assume for purposes of this decision that the de novo standard of review applies in determining whether the court's exclusion of the evidence violated Duclos's constitutional rights. (See *People v. Seijas* (2005) 36 Cal.4th 291, 304 [stating "independent review 'comports with this court's usual practice for review of mixed question determinations affecting constitutional rights' "].)

1.    *Governing law*

   a.    *Evidence Code section 352*

Evidence Code section 352 provides:

> "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

6

b. *A defendant's due process right to a fair trial and right to present a defense*

A defendant has the general right to offer a defense through the testimony of his or her witnesses. (*Washington v. Texas* (1967) 388 U.S. 14, 19.) Thus, the California Supreme Court has recognized that " 'Evidence Code section 352 must bow to the due process right of a defendant to a fair trial and to his right to present all relevant evidence of *significant* probative value to his defense.' " (*People v. Babbitt* (1988) 45 Cal.3d 660, 684 (*Babbitt*).) The *Babbitt* court emphasized, " 'We do not mean to imply, however, that a defendant has a constitutional right to present all relevant evidence in his favor, no matter how limited in probative value such evidence will be so as to preclude the trial court from using Evidence Code section 352.' " (*Ibid.*)

" 'As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense.' " (*People v. Blacksher* (2011) 52 Cal.4th 769, 821.) Thus, "although the complete exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law, the exclusion of defense evidence on a minor or subsidiary point does not interfere with that constitutional right." (*People v. Cunningham* (2001) 25 Cal.4th 926, 999.)

7

2.  *Factual and procedural background*

a.  *Duclos's motion in limine*

Prior to trial, Duclos filed a motion in limine in which he requested permission to present evidence at trial tending to demonstrate that he was in a dissociative fugue state and thus legally unconsciousness at the time of the charged offenses.  Specifically, Duclos sought to present expert testimony concerning this issue, percipient testimony from his parents concerning prior dissociative episodes, and his own testimony that he lacked any memory of committing the offenses.  Duclos also contended that "medical doctors, nurses, and deputy sheriffs[3] could testify about [his] suffering what absolutely appear[] to be . . . seizures that have resulted in him being and still being prescribed anti-epilepsy medications."  Duclos also requested permission to show a video lasting approximately one minute in length taken while he was in jail in which he appears to be having a seizure.

b.  *The initial hearing on Duclos's motion to introduce evidence related to dissociative fugue*

The trial court held a hearing on Duclos's motion.  Defense counsel argued that whether Duclos had a "desire to commit the acts and any memory of committing the acts would go to whether or not he had [the] specific intent to commit the charged offenses."  Counsel explained further that Duclos would testify that he had no such desire or memory.  Defense counsel also indicated that Dr. Raymond Murphy, a psychologist,

---

3     It is clear from the remainder of the record that these witnesses interacted with Duclos while he was incarcerated awaiting trial.

8

would testify that he had conducted an investigation concerning Duclos's statements that he had committed the acts comprising the charged offenses while in a dissociative fugue state. As a component of his investigation, Dr. Murphy reviewed a report authored by a neurologist, Dr. Frederic Martin, who had examined Duclos and determined that there was no organic neurological basis for Duclos's apparent lack of memory concerning his commission of the acts in question. Counsel explained that Dr. Murphy would testify that Duclos's actions were consistent with those of a person acting in a dissociative fugue state.

Defense counsel also stated that Duclos's family could testify that they had witnessed numerous episodes during which Duclos had engaged in what appeared to be purposive actions and later had no recollection of having committed the acts. Defense counsel further stated that Duclos's family could also testify that, since he was a child, Duclos had suffered what had been diagnosed as "partial complex seizures." Defense counsel added that Duclos had been on "anti-epilepsy medication" for most of his life. In explaining the relevance of evidence concerning these seizures, defense counsel stated:

> "Now, the court could very well ask, well, the fact that he may have suffered seizures, which were followed by some period of confusion, how does that relate to a dissociative fugue? [¶] And so I am talking about two different aspects of the psychiatric disorder. One is the dissociative-fugue episodes when he acts purposefully, doesn't recall. That is what Dr. Murphy can explain is an actual psychiatric phenomenon. Separately from that, but really related, is the fact that he has suffered seizure in the past, or what appears to be seizures, and that the medical establishment has also characterized as being partial complex seizures . . . ."

9

Defense counsel continued by stating that it was the defense's belief that the seizures were "part and parcel of a complicated psychiatric disease," and that the "medical professionals, nurses and doctors . . . [could] testify that Mr. Duclos . . . suffered what was described or perceived to be seizures, lack of memory, [and] confusion." Defense counsel explained that the jail video would depict Duclos "covered with blood" and "disoriented." Counsel continued by stating that the video showed Duclos "not following directions," and that he would "sit down and stand up and sit down again," before eventually appearing to be "startled" and "attacking the deputies." After the deputies restrained Duclos, he appeared to be startled again and began to ask the deputies what had just happened.

The prosecutor objected to the presentation of evidence that Duclos had suffered seizures in the past on the ground that there was "no evidence in this case of any kind of seizure activity" occurring at the time he committed the charged crimes. The prosecutor argued that Duclos's actions in stealing his brother's BB gun, taking a bus across town, committing a robbery and carjacking, and driving away constituted purposeful action. However, the prosecutor acknowledged that the defense should be allowed to present expert testimony concerning the mental state of dissociative fugue.

The court agreed that the defense should be permitted to present evidence that Duclos committed the charged offenses while legally unconscious. However, the court stated that it did not understand "how these things that have been described as seizures relate to the dissociative-fugue state." The court indicated that it would need a further

10

proffer of evidence concerning this issue or testimony from Dr. Murphy establishing the relevance of the seizure evidence.

Defense counsel agreed that "it is not readily apparent how . . . Dr. Murphy can connect what has been described by the medical establishment as seizure or seizure-like activity with a dissociative fugue, other than saying that he believes that both are psychogenic in nature." Defense counsel requested that the court reserve judgment on this issue in order to allow counsel to make a more specific proffer concerning the relevance of the seizure evidence. The court agreed to reserve making a final ruling on the admissibility of the evidence.

      c.     *The continued hearing on Duclos's motion to introduce evidence related to dissociative fugue state*

The following day, defense counsel made an additional offer of proof regarding the evidence that she wanted to present concerning Duclos's mental state at the time of the charged offenses. Defense counsel explained that she had spoken with Dr. Murphy and Dr. Martin. Dr. Martin informed defense counsel that Duclos's alleged actions in committing the charged offenses were *not* explainable as having occurred as the result of a partial complex seizure. However, Dr. Martin explained that the actions could be explained by a psychiatric diagnosis. Defense counsel stated that Dr. Murphy could provide that diagnosis.

Notwithstanding Dr. Martin's testimony that the seizures Duclos claimed to have suffered did not explain Duclos's conduct, defense counsel stated that, according to

11

Dr. Martin, Duclos might in fact suffer from such seizures. Defense counsel further stated that if Dr. Martin were permitted to explain the basis for his opinion that Duclos might suffer from such seizures, the presentation of a considerable amount of other testimony could be avoided:

> "If [Dr. Martin] is allowed to explain that as a basis for his opinions, that, in fact, [Duclos] may suffer from partial complex seizures because of the long, documented medical history, during which he was documented as suffering from partial complex seizures or suspected ones, then that would, I believe, negate the need for the defense to call witnesses. We have discussed how there [are] many witnesses, the medical doctors, the deputy sheriffs, the nurses in the jail, who would testify that he had what appeared to be seizures, that were treated as though he had seizures. He is known in the jail as someone who is at risk for seizures. If Dr. Martin was to explain what he relied upon, what he reviewed, what his opinions are, . . . then I believe it would not be necessary to call all those witnesses, because they would merely be establishing what Dr. Martin would be testifying to, which is that there has been a long diagnosis, a lengthy medical history of treating Mr. Duclos for seizures . . . ."

Defense counsel also indicated that Dr. Murphy would testify that "what has been described by Mr. Duclos and described by his family as seizures are very likely to have been actually descriptions of fugue dissociative states."

d. *The court's ruling*

After hearing defense counsel's proffer, the court stated that it understood that Dr. Murphy would testify that Duclos had exhibited symptoms of a dissociative fugue state and that his history of prior seizures tended to support this conclusion. The court indicated that this testimony was relevant "subject to [Evidence Code] section 352." The court then stated:

12

"It seems to me that the fact that emerges from Dr. Martin and from the medical records is that this man has been diagnosed with seizures. I don't even think that the People would say that's not true. I don't think that the People have a way of proving that he has not been diagnosed with seizures. I think it's also . . . not really disputable that he's been given seizure medication for it, or anti-seizure medication. [¶] Now, I think those two facts, that he's been diagnosed and he's been given medication for years, are relevant and admissible and may be testified to from review of the medical records. What I am not going to allow, either by live witnesses or from medical records, is all the evidence that supports these two facts."

After further explanation of its ruling, the trial court continued:

"So, bottom line, I am not going to allow all the evidentiary details that support the diagnostic conclusion that the doctors, since time immemorial in this case, have been saying the man has seizures, and he's been given medication for it. The evidence of the jail video, that's out. The family testimony, the parade of horribles, I think that is unduly time consuming, unduly prejudicial, evokes too much sympathy, takes a lot of time, is confusing. But the fact that he has been diagnosed, the fact that he's been medicated, that comes in."

After the court issued its ruling, defense counsel stated that she understood that the jail video would be excluded and that "medical doctors, deputy sheriffs, or nurses in the jail who witnessed or treated Mr. Duclos for what appeared to be seizure episodes," would not be permitted to testify. Defense counsel requested that Duclos's family members be permitted to testify that "they had observed him engage in purposeful activity and afterwards [he] expressed that he had no memory of it." The court ruled that the defense would be permitted to present this testimony.

13

e.      *Evidence presented at trial*

Duclos testified that he had no recollection of committing the charged offenses, and that he had suffered episodes of amnesia nearly his entire life.  Duclos also stated that he started having "seizures" after hitting his head on the edge of a swimming pool when he was nine years old.  Duclos explained that he started taking anti-seizure medication when he was 12 or 13 years old, but that he continued to experience seizures.  In addition, since he was approximately 13 or 14 years old, Duclos began engaging in seemingly purposeful acts of which he had no memory afterward.  As he grew older, Duclos committed acts that served as the basis for several criminal convictions, including convictions for grand theft and attempted robbery, of which he had no memory.

Duclos's parents testified that when Duclos was a child, they saw him suffer what appeared to be seizures during which he would bite his tongue and/or lose control of his bladder.  They also described instances during which Duclos would perform seemingly purposive actions and afterward have no memory of having performed the actions.

Dr. Martin testified that there are two types of neurologically based seizures.  Grand mal seizures are characterized by dramatic physical convulsions.  Complex partial seizures are characterized by sudden unresponsive states, mumbling, lip smacking or chewing, and brief moments of disorientation.  Both types of seizures are followed by periods of confusion.  Dr. Martin reviewed Duclos's medical history, which revealed that he had a "diagnosis of seizures" since his childhood, and that he had been treated with anticonvulsant medications.  However, Dr. Martin explained that Duclos might suffer from

14

psychogenic seizures because tests demonstrated no neurological basis for the seizures and it appeared from medical reports that, after some of the seizures, Duclos had not suffered a period of confusion.

Dr. Murphy testified that he had diagnosed Duclos as suffering from a "dissociative disorder." Dr. Murphy explained that, when in a dissociative fugue state, a person can appear to be conscious and acting purposefully but not in fact be conscious of his actions. Dr. Murphy stated that, according to Duclos, Duclos had long suffered from fugue states during which he performed tasks and later had no memory of having performed the tasks. Based on the facts of the charged offense, Dr. Murphy explained that Duclos's reported experience would "be consistent with a dissociative state."

3. *Application*

a. *The trial court did not abuse its discretion in limiting Duclos's presentation of evidence that he had recently suffered seizures*

Duclos contends that the trial court abused its discretion by "precluding [him] from presenting evidence of his most recent dissociative episodes." We are not persuaded.

Most importantly, the evidence that the trial court prevented Duclos from presenting was evidence of his suffering what appeared to be "seizures" during which he appeared *not* to be acting purposively. Thus, the evidence that the trial court excluded was not direct evidence of Duclos having been in a fugue state during which he appeared to be conscious and acting purposefully but was not in fact conscious of his actions.

15

Accordingly, the excluded evidence was, at best, marginally probative with respect to whether Duclos was in a fugue state at the time he engaged in the lengthy set of seemingly purposive acts that comprised the charged offenses, including committing the carjacking and robbery and driving away from the scene of the crimes.

Moreover, as the trial court noted, it was undisputed that Duclos had a long history of having suffered seizure-type symptoms. While Duclos contends that the evidence of the recent seizure episodes was "*highly* probative," defense counsel acknowledged in the trial court that this evidence would "not be necessary" to the extent that Dr. Martin was allowed to explain the basis for his opinion that Duclos might suffer from partial complex seizures. At the hearing on the in limine motion, the trial court ruled that Dr. Martin would be permitted to testify at trial as to the basis for his opinion that Duclos may have suffered from such seizures, and Dr. Martin provided testimony concerning this issue at trial.[4]

Further, Duclos was permitted to present considerable evidence through his own testimony, that of his parents, and also the testimony of two experts concerning his long history of having suffered seizures. Under these circumstances, the trial court acted well within its discretion in determining that it would be "unduly time consuming" for the defense to present the testimony of numerous additional witnesses on this issue.

---

[4]    For example, Dr. Martin explained that it was his impression that Duclos might have suffered from partial complex seizures "on the basis of his mother's reporting that he occasionally mumbled and stared off into space."

We are not persuaded by Duclos's contention that the trial court abused its discretion in considering the amount of time that it would take to present the evidence he proffered, because the court permitted the People to present evidence of Duclos's commission of numerous uncharged offenses. In making this argument, Duclos posits a false equivalency. The prosecution's evidence of uncharged offenses was admissible both to rebut Duclos's defense that he was unconscious at the time of the charged offense and to impeach his credibility.[5] The trial court did not abuse its discretion in determining that the probative value of this evidence justified the time that it would take to present. The trial court was not required to permit the defense to present marginally probative, and largely cumulative, testimony, simply because it permitted the People to present evidence of Duclos's commission of uncharged crimes.

We also reject Duclos's contention that the trial court abused its discretion in expressing its concern that showing the video of Duclos in jail might improperly evoke sympathy or confusion among the jurors. According to defense counsel's description of the video during in limine proceedings, the video depicted Duclos in a custodial setting, "covered with blood" and "disoriented." The trial court did not abuse its discretion in determining that the potential prejudice from showing the jury this video substantially outweighed the minimal probative value that a showing might have had.

We further reject Duclos's contention that, pursuant to this court's decision in *People v. Diaz* (2014) 227 Cal.App.4th 362, the trial court erred in failing to view the jail

---

[5] Duclos does not contend otherwise on appeal.

video prior to ruling on its admissibility. As we made clear in *People v. Diaz*, a "trial court may rely on an offer of proof in considering whether to permit [the] jury to view a video at trial." (*Id*. at p. 379, fn. 11, citing *People v. Holford* (2012) 203 Cal.App.4th 155, 174.) In *People v. Diaz*, we concluded that the trial court erred in failing to view the videos at issue in that case before permitting them to be shown at trial because the People's offer of proof, which included the transcripts of the videos, "should have alerted the court to the potential for extreme prejudice if the jury were to be shown the videos." (*People v. Diaz, supra*, at p. 379.) In contrast, in this case, there was nothing in defense counsel's offer of proof that suggested a need for the trial court to view the actual video before ruling on its admissibility.

Finally, this case is entirely distinguishable from *People v. Cortes* (2011) 192 Cal.App.4th 873 (*Cortes*), upon which Duclos heavily relies. In *Cortes*, the trial court ruled that the defense's psychiatric expert "could testify about dissociation and posttraumatic stress disorder in general, *but could not testify about defendant's mental condition at all*." (*Id*. at p. 891.) In contrast, in this case, both Dr. Martin and Dr. Murphy testified *extensively* about Duclos's mental condition, including Dr. Murphy testifying that he had diagnosed Duclos as having a "dissociative disorder." The minor limitation that the trial court imposed on the defense's presentation of evidence concerning Duclos's seizures is in no way comparable to the wholesale exclusion of defense evidence concerning the defendant's mental state at issue in *Cortes*. (See *ibid*.;

18

see also *id*. at pp. 899-900 [listing numerous restrictions on the defense expert's proffered testimony].)

Accordingly, we conclude that the trial court did not abuse its discretion in limiting the presentation of evidence related to Duclos's unconsciousness defense pursuant to Evidence Code section 352.

b.      *The trial court did not violate Duclos's constitutional rights by limiting the presentation of evidence related to his unconsciousness defense*

As discussed above, the trial court permitted Duclos to present extensive evidence in support of his defense that he was in a dissociative fugue state at the time he committed the acts comprising the charged offenses, including his own testimony, the testimony of his parents, and that of two experts. Importantly, the trial court allowed Duclos and his parents to testify about his prior commission of acts during which he appeared to be acting purposively but later did not remember. The court also permitted Dr. Murphy to testify that he had diagnosed Duclos as suffering from a dissociative disorder and that Duclos's acts on the day of the charged offenses were consistent with those of a person acting in a dissociative fugue state. In addition, for the reasons stated above, the evidence that the trial court did prevent Duclos from presenting was not highly probative. Under these circumstances, the trial court's evidentiary rulings did not violate Duclos's constitutional right to present a defense. (See *People v. Boyette* (2002) 29 Cal.4th 381, 428 [" 'Although completely excluding evidence of an accused's defense

19

theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense.' "].)

With respect to Duclos's contention that the trial court violated his right to due process in allowing the prosecution to present evidence of his commission of uncharged crimes while preventing Duclos from presenting additional evidence of his suffering from seizures, we are not persuaded that principles of due process enunciated *Green v. Georgia* (1979) 442 U.S. 95 (*Green*) mandate that the trial court permit the defense to present the marginally probative evidence of Duclos's seizures in light of the trial court's admission of the evidence of his uncharged crimes. In *Green*, the United States Supreme Court concluded that the due process clause of the fourteenth amendment required that a defendant on trial for a capital crime be permitted to present evidence of his accomplice's admission that the accomplice committed the murder underlying the defendant's capital charge, notwithstanding that the proffered evidence was inadmissible under state law as hearsay. In support of its ruling, the *Green* court reasoned that the evidence was "highly relevant to a critical issue" in a capital case and that "the State considered the testimony sufficiently reliable to use it against [the accomplice in his separate trial], and to base a sentence of death upon it." (*Id*. at p. 97.) In this case, the excluded evidence was marginally probative, and the trial court's exclusion of that evidence, while allowing the People to present evidence of Duclos's commission of uncharged crimes, did not amount to an arbitrary application of the state's evidentiary rules. Further, *Green* does not provide that a trial court must permit a defendant to present all marginally probative

20

relevant evidence whenever the court permits the prosecution to present inculpatory evidence with respect to a particular issue.

Accordingly, we conclude that the trial court did not violate Duclos's constitutional rights by limiting the defense's presentation of evidence related to his seizures.

B.      *The trial court did not relieve the prosecution of its burden to prove every element of the charged offenses beyond a reasonable doubt by instructing the jury pursuant to the standard CALCRIM instruction on unconsciousness*

Duclos contends that the trial court erred in instructing the jury pursuant to the standard CALCRIM instruction on unconsciousness, CALCRIM No. 3425. Duclos maintains that the instruction improperly lessened the prosecution's burden to prove every element of the charged offenses beyond a reasonable doubt, in violation of his federal constitutional right to due process. We review this contention pursuant to the de novo standard of review. (See *People v. Guiuan* (1998) 18 Cal.4th 558, 569-570 [jury instruction claim that involves the determination of applicable legal principles is reviewed de novo].)

The trial court instructed the jury pursuant to a modified version of CACLRIM No. 3425 in relevant part as follows:

> "The people must prove beyond a reasonable doubt that the defendant was conscious when he acted. If there is proof beyond a reasonable doubt that the defendant acted as if he were conscious, then you should conclude that he was conscious unless based on all the evidence, you have a reasonable doubt that he was conscious, in which case you must find him not guilty."

Duclos acknowledges that the California Supreme Court in *Babbitt, supra*, 45 Cal.3d 660 concluded that a nearly identical instruction (former CALJIC No. 4.31) did

22

not violate due process by impermissibly lightening the prosecution's burden of proving

every element beyond a reasonable doubt.[6]  The *Babbitt* court reasoned in part:

> "Unconsciousness is a defense. (§ 26.)  Although the state, once the defendant raises the issue, has assumed the burden of disproving unconsciousness, this fact of itself does not transform absence of the defense—consciousness—into an element of murder for purposes of due process analysis.  This is true even though unconsciousness negates the elements of voluntariness and intent, and when not voluntarily induced is a complete defense to a criminal charge [Citations.]  [Citation]  [¶]  In sum, because consciousness is not an element of the offense of murder (nor of any offense), [former] CALJIC No. 4.31 does not impermissibly shift to the defendant the burden of negating an element, nor does the instruction violate due process by impermissibly lightening the prosecution's burden of proving every element beyond a reasonable doubt."  (*Babbitt, supra*, at p. 693.)

Duclos does not contend either that CALCRIM No. 3425 differs in any material

manner from the instruction upheld by the *Babbitt* court or that his claim is different from

the one rejected in *Babbitt*.  Rather, Duclos maintains that "*Babbitt* must be reconsidered"

in light of the United States Supreme Court decisions in *Apprendi v. New Jersey* (2000)

530 U.S. 466 (*Apprendi*) and *Alleyne v. United States* (2013) ___ U.S. ___ [133 S.Ct.

2151] (*Alleyne*).  Specifically, Duclos contends that *Apprendi* and *Alleyne* "implicitly

---

6    The instruction at issue in *Babbit* stated in relevant part:
      " 'If the evidence establishes beyond a reasonable doubt that at the time of the commission of the alleged offense the defendant acted as if he were conscious, you should find that he was conscious, unless from all the evidence you have a reasonable doubt that he was in fact conscious at the time of the alleged offense.  [¶] 'If the evidence raises a reasonable doubt that he was in fact conscious, you must find that he was then unconscious.' "  (*Babbit, supra*, 45 Cal.3d at p. 691, fn. 9.)

overrule" *Babbitt* because these decisions also "implicitly overruled" another decision of the United States Supreme Court, *Patterson v. New York* (1977) 432 U.S. 197, upon which the *Babbitt* court relied for its conclusion that consciousness was not an element of the offenses at issue in *Babbitt*. Duclos contends that *Apprendi* and its progeny "redefine what constitutes an 'element' of an offense to include any fact that 'alters the legally prescribed punishment so as to aggravate it.' " (Quoting *Alleyne, supra*, 133 S.Ct. at p. 2162.) Duclos further argues that "[w]hen evidence brings the defendant's consciousness into question, that fact alters the legally prescribed punishment, making it an element of the offense under *Alleyne*."

We have serious doubts concerning whether *Apprendi* or its progeny overruled *Patterson*, implicitly or otherwise, and whether these cases implicitly overrule *Babbitt's* conclusion, that "consciousness is not an element of the offense of murder (nor of any offense)." (*Babbitt, supra*, 45 Cal.3d at p. 693.) Specifically, we question whether evidence of unconsciousness "alters the legally prescribed punishment so as to aggravate it" (*Alleyne, supra*, 133 S.Ct. at p. 2162) as that phrase is used in *Apprendi* and its progeny.

In any event, Duclos acknowledges that "an appellate court should follow California Supreme Court decisions regarding federal constitutional issues unless the United States Supreme Court provides *direct, contrary authority*." That principle is dispositive of Duclos's claim in this court. It is clear, even to Duclos, whose argument expressly relies on two levels of purported *implicit* overrulings, that the United States

24

Supreme Court has not *directly* overruled *Babbitt*. Until either the California Supreme Court or the United States Supreme Court provides authority that is *directly contrary* to *Babbitt*, we are bound to follow that decision. (See, e.g., *People v. Medina* (2007) 158 Cal.App.4th 1571, 1580 ["[U]ntil the United States Supreme Court provides direct authority, we are bound to follow the law of the California Supreme Court."].)

Accordingly, we conclude that the trial court did not relieve the prosecution of its burden to prove every element of the charged offenses beyond a reasonable doubt by instructing the jury pursuant to CALCRIM No. 3425.

C. *The trial court did not err in failing to suppress a photograph taken from Duclos's cell phone because the search of the phone was conducted in good faith under then-existing California law*

Duclos contends that the trial court erred in failing to exclude from evidence a photograph taken from Duclos's cell phone because the search of the phone was conducted without a warrant as required under *Riley v. California* (2014) ___ U.S. ___ [134 S.Ct. 2773] (*Riley*). The People contend that suppression was not warranted because the search of the phone was conducted in good faith under *People v. Diaz* (2011) 51 Cal.4th 84 (*Diaz*).[7] Whether the good-faith exception to the exclusionary rule applies under these circumstances is a question of law that we review de novo. (See *U.S. v. Burgess* (10th Cir. 2009) 576 F.3d 1078, 1095 ["Whether the 'good faith exception' to the

_____

[7] The issue of whether the good-faith exception to the exclusionary rule applies to searches conducted pursuant to *Diaz* before *Riley* is pending before the California Supreme Court. (See *People v. Macabeo*, review granted Nov. 25, 2014, S221852.)

25

exclusionary rule should be applied is a question of law, subject to de novo review by this

Court.]".)

1.    *Factual and procedural background*

Detective Smith testified that police found a cell phone in Duclos's pocket at the time of his arrest.  Before interviewing Duclos, Smith searched the cell phone.  Detective Smith found "a photo of a handgun that appeared to be the same handgun that was used in the crime."[8]  The People presented a photograph of the cell phone photograph to the jury and the trial court admitted the photograph that was shown to the jury in evidence.

During his cross-examination of Duclos, the prosecutor noted that the time stamp on the cell phone photograph indicated that the photograph had been taken about two and a half hours before the commission of the charged offenses.  Duclos admitted that the photograph depicted the gun used in the offenses, but stated that he was "not sure exactly" if he had taken the photograph.  Duclos acknowledged having the cell phone with him "all day" on the day of the offenses.

2.    *Governing law*

a.    *The law governing the search of a defendant's cell phone incident to an arrest*

In *Diaz, supra*, 51 Cal.4th at page 88, the California Supreme Court held that a warrantless search of a defendant's cell phone was constitutional, as long as the search was conducted incident to a lawful custodial arrest.  The *Diaz* court concluded that the search of the cell phone was analogous to other searches that the United States Supreme

---

8    As noted previously, the handgun was in fact a BB gun.

27

Court had determined to be lawful in that the defendant's cell phone was " 'personal property . . . immediately associated with [his] person' . . . . " (*Id*. at p. 93.)

In *Riley*, the United States Supreme Court reversed a decision of this court decided in reliance on *Diaz*. (*Riley, supra*, 134 S.Ct. at p. 2481.) The *Riley* court concluded that police may not conduct a warrantless search of "digital information on a cell phone seized from an individual who has been arrested." (*Id*. at p. 2480.) After discussing the rationales for the search incident to arrest doctrine and the nature of data commonly stored on cell phones, the *Riley* court concluded that "a warrant is generally[9] required before such a search, even when a cell phone is seized incident to arrest." (*Id*. at p. 2493.)

> b.       *Evidence obtained in a search conducted in good faith reliance on binding appellate precedent is not subject to the exclusionary rule*

*In Davis v. United States* (2011) ___U.S. ___ [131 S.Ct. 2419] (*Davis*), the United States Supreme Court considered whether evidence obtained from a search conducted in reasonable reliance on binding appellate authority may be excluded pursuant to the exclusionary rule when that authority is overruled by a decision released *after* the search. The *Davis* court explained that the rule requiring exclusion of evidence obtained in violation of the Fourth Amendment is proper when the law enforcement action in

---

9       The *Riley* court noted that "even though the search incident to arrest exception does not apply to cell phones, other case-specific exceptions may still justify a warrantless search of a particular phone." (*Riley, supra*, at p. 2494.) For example, the *Riley* court noted that exigent circumstances may apply to permit a warrantless search given the particular circumstances of a case. (*Ibid*.) The People do not contend on appeal that the search of Duclos's cell phone was lawful under any such exceptions.

question constitutes " 'deliberate,' 'reckless,' or 'grossly negligent' " conduct. (*Davis, supra*, at p. 2427.) The *Davis* court explained that "the deterrent value of exclusion is strong" under these circumstances, and "tends to outweigh the resulting costs." (*Ibid*.) In contrast, when "the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful," the " ' "deterrence rationale loses much of its force," ' and exclusion cannot 'pay its way." ' " (*Id*. at p. 2428.) Permitting the exclusion of evidence obtained during a search conducted pursuant to then-binding appellate precedent authorizing a search would be to " '[p]enaliz[e] the officer for the [appellate judges'] error.' " (*Id*. at p. 2429.) Accordingly, the *Davis* court concluded, "We therefore hold that when the police conduct a search in objectively reasonable reliance on binding appellate precedent, the exclusionary rule does not apply." (*Id*. at p. 2434.)

3.      *Application*

Detective Smith conducted the search at issue in this case prior to the United States Supreme Court's decision in *Riley*. At the time Detective Smith searched Duclos's cell phone, the California Supreme Court's decision in *Diaz* was the clearly established law in this state. Because the *Diaz* court held that a warrantless search of a defendant's cell phone was constitutional when conducted as a search incident to a lawful custodial arrest, *Diaz, supra*, 51 Cal.4th 84 clearly authorized the search of Duclos's phone. Accordingly, because the search was conducted in "objectively reasonable reliance on binding appellate precedent, the exclusionary rule does not apply." (*Davis, supra*, 131 S.Ct. at p. 2434.)

29

Duclos's arguments to the contrary are not persuasive. Duclos notes that *Diaz* involved a search of a *text message* contained in a cell phone, while this case involves a search of a *photograph* stored in a cell phone. Duclos contends that the *Diaz* court could have "crafted its holding to cover broader cell phone searches, including searches of photographs stored on cell phones," but that the *Diaz* court did not do so. We reject this contention. Duclos presents no argument as to why a search for photographs stored in the data contained in a cell phone is a "broader" search than one for text messages stored in such data. Nor is there any language in *Diaz* that would suggest that such a distinction should be drawn. (See also *Riley, supra*, 134 S.Ct. at p. 2481 [stating that the *Diaz* court "held that the Fourth Amendment permits a warrantless search of *cell phone data* incident to an arrest, so long as the cell phone was immediately associated with the arrestee's person" (italics added)].)

Duclos also argues that it would have been unreasonable for Detective Smith to rely on *Diaz* because *Riley* was a unanimous opinion decided three years after *Diaz*, *Diaz* was not consistent with prior United States Supreme Court case law, the concurring and dissenting opinions in *Diaz* foreshadowed *Riley*, and case law decided *after* the search of Duclos's phone demonstrated that "the [United States] Supreme Court would soon overrule *Diaz*." As noted above, *at the time of the search*, there was binding California Supreme Court decision directly on point that authorized the search.[10] (*Diaz, supra*, 51

---

[10] In contending that we should review this issue notwithstanding that defense counsel did not object to the introduction of the evidence in the trial court, Duclos

Cal.4th at p. 88.) We are aware of no authority that would require law enforcement officers to determine the doctrinal soundness of opinions of our Supreme Court at the time they conduct a search. Accordingly, we conclude that the good faith exception applies and that the evidence gathered in the search of Duclos's cell phone need not be suppressed. (*Davis, supra*, 131 S.Ct. at p. 2427.)

D.     *There is no cumulative error*

Duclos contends that the cumulative effect of the errors that he alleges requires reversal. "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) We have concluded that none of Duclos's asserted claims of error has merit. As a result, there are no errors for which the cumulative effect would require reversal of the judgment against him.

---

acknowledges "at the time of Mr. Duclos's trial, binding California law made any objection to the cell phone evidence futile." (Citing *Diaz*.)

31

IV.

DISPOSITION

The judgment is affirmed.

AARON, J.

WE CONCUR:

HUFFMAN, Acting P. J.

McDONALD, J.