Filed 4/23/21  P. v. Green CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TIMOTHY LOYD GREEN,<br><br>    Defendant and Appellant. | D076323<br><br><br><br>(Super. Ct. No. SCD275923) |
| In re TIMOTHY LOYD GREEN on Habeas Corpus. | D078067 |


APPEAL from orders of the Superior Court of San Diego County, Esteban Hernandez, Judge.  Affirmed.  Petition for habeas corpus denied; order to show cause discharged.

Janice R. Mazur, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steven T. Oetting and Amanda Lloyd, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

## INTRODUCTION

Timothy Loyd Green and his codefendant, Eddie Siscon, worked for All Road Satellite (ARS), a company that provides satellite telephone equipment and service to its customers. During the time that Green and Siscon were working for ARS, the pair created a competing satellite telephone company, Apollo Satellite Communications (Apollo). Green and Siscon began surreptitiously switching ARS customers from the ARS billing system and placing those customers in Apollo's billing system so that the customers were paying Apollo, rather than ARS, for their satellite telephone service. While perpetrating this scheme, Siscon made notes in the customers' ARS files that were intended to prevent ARS from discovering what was occurring. After being criminally charged in connection with this scheme, both Green and Siscon pled guilty to obtaining the personal identifying information of 10 or more individuals with the intent to defraud, in exchange for the prosecution's agreement to drop grand theft charges against them.

The trial court held a contested restitution hearing regarding the amount of loss that ARS incurred as a result of the defendants' ploy. At the conclusion of that hearing, the trial court ordered Green and Siscon, jointly and severally, to pay $3,613,600.39 in victim restitution to ARS to account for the revenue that it lost as a result of Green's and Siscon's scheme.

On direct appeal from the judgment, Green raises two arguments. First, Green contends that the trial court's ruling granting the People's motion to quash a subpoena for ARS's tax records denied him the opportunity to present a complete defense at the restitution hearing. Second, Green challenges the restitution amount, arguing that it is unsupported and based on unreliable evidence.

2

Green also filed a petition for a writ of habeas corpus, arguing that "newly discovered evidence" demonstrates that Green was ordered to pay restitution for business losses for a time period during which ARS "could not legally operate." (Capitalization omitted.) We issued an order to show cause in the habeas corpus proceeding.[1]

We conclude that Green's contentions on direct appeal are without merit. We therefore affirm the orders of the trial court. We further conclude that Green has not demonstrated that he is entitled to writ relief. We therefore deny the habeas corpus petition and discharge the order to show cause.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual background*[2]

ARS operates a satellite communication company and rents or sells satellite telephones and service plans to its customers. Janet Leigh is ARS's owner, and Nicole Garegnani is the office manager. ARS has been in business since 2005. In 2012, two former employees opened a competing satellite communication company. Sometime after that, ARS hired Siscon to help rebuild the company. At Siscon's recommendation, ARS hired Green a few months later to upgrade the company's hardware and create a new

---

[1] On October 21, 2020, we ordered that the petition for writ of habeas corpus in case No. D078067 be considered with Green's direct appeal in case No. D076323.

We now order case Nos. D078067 and D076323 consolidated, and we address both matters in this opinion.

[2] Because Green pled guilty, this factual background is based on the facts to which Green admitted, the facts as described in the probation report, and certain facts elicited at the sentencing and postsentencing hearings.

website.  Green falsely told ARS management that the company's data would have to be transferred to his personal server in order for him to create the new website.  He was provided with a company credit card in order to purchase items on behalf of the company.

In October 2015, Garegnani fired Green after discovering that he had fraudulently used the company credit card to charge $57,000 in unauthorized purchases, had not made any changes to the company's website, and had charged the company for work that he had not performed.  Garegnani confronted Siscon and asked whether he knew about Green's actions.  Siscon indicated that he had not known about Green's fraudulent use of the credit card.  Garegnani initially believed Siscon.  She later found out that Siscon had been aware of, and had participated in Green's actions.

Garegnani also discovered that Green had started a competing satellite phone company, Apollo, in May 2013, while he was working for ARS.  She also found out that Siscon and Green had stolen approximately $230,000 in equipment from ARS, and that they had appropriated the company's customer database.[3]  At the time the probation report was prepared in 2018,

---

[3]     An Apollo employee informed Garegnani that he saw satellite telephones with ARS's labels on them in Apollo's office.  This Apollo employee also told Garegnani that Siscon and Green had been bragging to people about stealing customers and equipment from ARS.

Another individual who was a roommate of Green and Siscon also contacted Garegnani about Apollo and the scheme involving ARS.  This individual described Green as "the one with the 'good name' while Siscon is doing 'all this fraudulent stuff.' "  The roommate indicated that Siscon and Green had "stole[n] several satellite phones and some other equipment from [ARS]," and that "they 'stole this poor lady's business.' "  The pair had asked this individual to "use his [bank] account to hide the money they were stealing" and they continued to "run[ ] [the customers'] credit cards to obtain money."  According to this individual, the men indicated that the customers

4

Garegnani estimated that ARS had lost approximately $50,000 to $60,000 per month in revenue since October 2013 as a result of Green's and Siscon's actions.[4]

By April 2014, an ARS employee became aware of the fact that Siscon was "double billing some of [ARS's] customers," and that Siscon had "moved several of [ARS's] customers to Apollo." Some customers had figured out that they had been billed twice; when these customers called ARS to inquire, ARS "would look up the customer accounts and could not find them, as Siscon had removed the accounts or had changed them to look like they were not customers." The ARS employee also indicated that Siscon had been able to conceal these fraudulent activities for such a long time in part because he had given customers his personal cellular phone number and customers would call him directly if there was any problem. A customer who had been with ARS since 2011 explained to police who were investigating the case that after he was suddenly billed by an entity named Apollo, Siscon explained the change by telling him that ARS had converted to a new billing system.

In January 2016, police obtained an arrest warrant for Green. When they arrived at the home Green shared with Siscon, police arrested Green and searched the premises, taking computers, miscellaneous equipment, and paperwork.[5] Police showed Garegnani some of the documents that were recovered from Green's home, and she confirmed that several of the accounts

---

"were wealthy people who did not notice $1,000.00 or $2,000.00 missing every month."

[4] Siscon had become "office manager" of ARS in August 2013, and "took over the billing" at that point. This was "when all of the customer accounts stopped getting billed by our merchant account and [were] billed by Apollo."

[5] Siscon was apparently not home at the time.

5

that were paying Apollo had been ARS accounts. Garegnani indicated that ARS had been unable to find or track many of the customers who had been switched to Apollo because Siscon had removed the credit card and contact information from the customers' files at ARS.

Based on data that police collected from Green and Siscon's home, Garegnani was able to piece together information regarding 85 customer accounts that Green and Siscon had transferred from ARS to Apollo. Garegnani also identified 43 checks that had been written to Apollo from 11 ARS customers.

At the time the probation report was written, Garegnani indicated that because the owner of the company was ill, Garegnani had been helping to care for the owner and had also been trying to handle all of the company's financial issues related to the defendants' criminal acts. Although Garegnani told the probation officer that ARS was seeking $1,400,000 in losses, she also told the probation officer that the "real loss to the company was probabl[y] three times the amount" that ARS was requesting.

B. *Procedural background*

The People filed a felony complaint against Green and Siscon on March 9, 2018. Count 1 alleged that the defendants committed grand theft of personal property with a value in excess of $950 from ARS Satellite (Pen. Code,[6] § 487, subd. (a)), and count 2 alleged that the men obtained the personal identifying information of ten or more individuals with the intent to defraud (§ 530.5, subd. (c)(3)).

Green pled guilty to obtaining the personal identifying information of 10 or more individuals with the intent to defraud as alleged in count 2 on

---

[6] Further statutory references are to the Penal Code unless otherwise indicated.

6

October 23, 2018. In exchange for Green's guilty plea to count 2, the prosecutor dismissed the grand theft charge in count 1. The plea agreement noted that the restitution amount would be determined at a later date.

On December 13, 2018, the trial court suspended imposition of Green's sentence for three years and placed him on formal probation, which included a commitment to the custody of the sheriff for 365 days and the imposition of various other terms and conditions. The court scheduled a hearing to determine the amount of victim restitution.

The court held a hearing on the matter of restitution on July 29, 2019. After hearing testimony from Garegnani and from Green, the trial court ordered victim restitution in the amount of $3,613,600.39.

Green filed a timely notice of appeal.[7]

## III.

## DISCUSSION

A. *Green's direct appeal from his conviction and sentence*

   1. *The trial court did not abuse its discretion in ordering Green to pay $3,613,600.39 in restitution for ARS's claimed losses*

Green contends that the trial court abused its discretion in ordering Green to pay restitution to ARS, jointly and severally with Siscon, in the amount of approximately $3.6 million.

   a. *Relevant legal standards*

Every victim who "suffers losses as a result" of a crime is entitled to restitution from the person convicted of committing that crime. (Cal. Const., art. I, § 28, subd. (b); *People v. Giordano* (2007) 42 Cal.4th 644, 652 (*Giordano*).) The Penal Code directs trial courts that "in every case in which

---

[7]    Green filed a notice of appeal on August 2, 2019, and filed an amended notice of appeal on August 27. 2019.

a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." (§ 1202.4, subd. (f).) Further, to "the extent possible, the restitution order . . . shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct[.]" (*Id.*, subd. (f)(3).)

"[I]f two defendants convicted of the same crime caused a victim to suffer economic loss, a court may impose liability on each defendant to pay the full amount of the economic loss, as long as the victim does not obtain a double recovery." (*People v. Leon* (2004) 124 Cal.App.4th 620, 622.)

"[A] prima facie case for restitution is made by the People based in part on a victim's testimony on, or other claim or statement of, the amount of his or her economic loss. [Citations.] 'Once the victim has [i.e., the People have] made a prima facie showing of his or her loss, the burden shifts to the defendant to demonstrate that the amount of the loss is other than that claimed by the victim.'" (*People v. Millard* (2009) 175 Cal.App.4th 7, 26 (*Millard*).) "'[T]he standard of proof at a restitution hearing is by a preponderance of the evidence, not proof beyond a reasonable doubt.'" (*People v. Tabb* (2009) 170 Cal.App.4th 1142, 1153.) "'[T]he trial court is entitled to consider the probation report when determining the amount of restitution.'" (*People v. Keichler* (2005) 129 Cal.App.4th 1039, 1048.) Further, evidentiary requirements at a restitution hearing are less stringent than in other phases of the criminal prosecution, and documentary evidence, such as bills, receipts, as well as estimates, business records, and similar

8

documents are not to be excluded as hearsay. (Pen. Code, § 1203.1d, subd. (d).)

While restitution orders awarded as part of a prison sentence are limited to "losses caused by the criminal conduct for which the defendant sustained the conviction," that limitation does not apply when restitution is ordered in the context of probation. (*People v. Woods* (2008) 161 Cal.App.4th 1045, 1050.) " 'California courts have long interpreted the trial courts' discretion to encompass the ordering of restitution as a condition of probation even when the loss was not necessarily caused by the criminal conduct underlying the conviction. Under certain circumstances, restitution has been found proper where the loss was caused by related conduct not resulting in a conviction [citation], by conduct underlying dismissed and uncharged counts [citation], and by conduct resulting in an acquittal [citation].' " (*Ibid.*; quoting, *People v. Carbajal* (1995) 10 Cal.4th 1114, 1121 (*Carbajal*).) Further, "[t]here is no requirement the restitution order be limited to the exact amount of the loss in which the defendant is actually found culpable, nor is there any requirement the order reflect the amount of damages that might be recoverable in a civil action." (*Carbajal*, at p. 1121.)

In *Millard, supra*, 175 Cal.App.4th at page 26, this court outlined the standard of review to be applied to a trial court's victim restitution order:

> " 'The standard of review of a restitution order is abuse of discretion. "A victim's restitution right is to be broadly and liberally construed." [Citation] " 'When there is a factual and rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court.' " [Citations.]' . . . 'In reviewing the sufficiency of the evidence [to support a factual finding], the " 'power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the trial court's findings." [Citations.] . . . "If the circumstances

9

reasonably justify the [trial court's] findings," the judgment may not be overturned when the circumstances might also reasonably support a contrary finding. [Citation.] We do not reweigh or reinterpret the evidence; rather, we determine whether there is sufficient evidence to support the inference drawn by the trier of fact.' "

Although all restitution orders are reviewed for abuse of discretion, it is important to remember that "the scope of a trial court's discretion is broader when restitution is imposed as a condition of probation." (*Giordano, supra*, 42 Cal.4th at p. 663, fn. 7.) "While the court need not order restitution in the precise amount of loss, it 'must use a rational method that could reasonably be said to make the victim whole, and may not make an order which is arbitrary or capricious.' " (*People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1172.)

### b. *Analysis*

Green argues that Garegnani's testimony at the restitution hearing was, essentially, unreliable, and that the trial court abused its discretion in relying on her testimony and her exhibits in setting the amount of restitution. Green's contentions are without merit.

Again, the initial burden on the prosecution at a restitution hearing is minimal, in that the People need only make a prima facie case for restitution. Several courts have found that a victim's *mere statement of losses* to a probation officer as reported in a probation report is sufficient to shift the burden to the defendant. (See, e.g., *People v. Gemelli* (2008) 161 Cal.App.4th 1539, 1543 (*Gemelli*).) As previously noted, "[o]nce the victim makes a prima facie showing of economic losses incurred as a result of the defendant's criminal acts, the burden shifts to the defendant to disprove the amount of losses claimed by the victim." (*Ibid.*) Further, a trial court may " 'use any rational method of fixing the amount of restitution which is reasonably

10

calculated to make the victim whole.'" (*People v. Goulart* (1990) 224 Cal.App.3d 71, 83.)

Garegnani, a representative of ARS, testified concerning the monetary losses that ARS was claiming, and the court impliedly found Garegnani's testimony credible, while expressly rejecting Green's testimony at the restitution hearing as not credible. Garegnani prepared two exhibits to demonstrate the calculation of losses that ARS was claiming. Exhibit 1 was a table that Garegnani prepared, based on ARS's merchant credit card statements. Garegnani explained the merchant credit card statements "reflect how much is billed every month" when the customers' "credit cards are processed." As Garegnani was able to show through her table summarizing those merchant statements, a significant decrease in ARS's monthly credit card revenues began in August 2013, which is when Siscon began transferring customers' billing from ARS to Apollo. Garegnani testified that, on average, ARS's monthly credit card revenue between October 2012 and August 2013 was approximately $158,000. However, between August 2013 and December 2018, when Green was sentenced, ARS took in approximately $100,000 *less* each month in credit card revenue, on average.[8] Over the period of nearly five years that ARS suffered losses as a result of Green and Siscon's scheme, the credit card revenue losses amounted to approximately $6.47 million. This sum did not include $280,000 in property that the defendants had stolen and given to customers.

Garegnani also testified regarding another possible measure of ARS's losses, based on her reconstruction of the stolen accounts of 85 customers.

---

[8]    Garegnani testified that most of the customers that ARS lost had not returned by December 2018, and that ARS continued to suffer lost revenue as a result of the loss of those customers' business through 2018.

Garegnani was able to reconstruct the accounts based on documents and files recovered from the defendants' home. She created a separate table with relevant information related to the accounts for these 85 customers. This table included the names of the customers who had been taken off of ARS's accounting system, the monthly amounts that these customers had been paying ARS for services; the date each identified customer last paid ARS; the date ARS finally stopped paying for the "SIM card" service for the account[9]; the cost of the equipment that the customer had been given by the defendants that had not been paid for; and any "reimbursement" that had been credited by the defendants to certain customers from ARS's account.[10] The monthly revenue from these 85 customers amounted to a total loss of approximately $59,000, which, over the 57 month period between 2013 and the end of 2018 for which ARS was seeking restitution, totaled almost $3.4 million. When that amount is added to the value of the equipment given to the customers by the defendants and the value of the "reimbursements" that the defendants made to these customers from ARS's account, the losses totaled $3,613,600.39. Garegnani explained that this method of calculating ARS's loss was not exhaustive. She detailed that these 85 customers and the information for them was "just what we were able to put together" based on what police managed to retrieve from Green and Siscon's home, and that

---

[9] Garegnani described how ARS continued to pay for service on these customers' SIM cards, which "ke[pt] the customers' phones active and usable," for some period of time after Green and Siscon transferred their accounts to Apollo because ARS was unaware that the customers were no longer paying ARS and were instead paying Apollo.

[10] Garegnani explained that with respect to "pretty much every customer that was stolen," Siscon had "refunded them a large amount of money [from ARS's accounts] before they were switched" to Apollo's system.

because the defendants had erased all of the stolen customers' information from ARS's system, ARS "d[id not] have any way of knowing exactly how many and every customer that was stolen." Garegnani testified that "[t]here'[re] still customers that we don't know about."[11]

The trial court ultimately decided to rely on the method of calculation of revenue loss based on the 85 stolen accounts and ordered Green to pay victim restitution in the amount of $3,613,600.39, jointly and severally with Siscon. A court is entitled to consider and rely on a witness's testimony at a restitution hearing. As noted, the court found Garegnani's testimony to be credible. Garegnani's testimony is thus sufficient to support the trial court's finding that Green's theft of more than 85 customer accounts from ARS resulted in the claimed losses. (See *Gemelli, supra*, 161 Cal.App.4th at p. 1545 [" '[d]eferential review is particularly necessary when, as here, the factual determination depends in part on judging a witness's credibility,' and we must uphold such a determination if it is supported by substantial evidence"].) The trial court therefore did not abuse its discretion in relying on Garegnani's testimony regarding the revenue losses between 2013 and December 2018, the date of Green's sentencing, to determine the amount of restitution. (See *id.* at p. 1546.)

We also reject Green's specific appellate attacks on the reliability of the evidence presented by the prosecution. For example, Green takes issue with the fact that the amount of losses noted in the probation report was reported

---

11    The fact that there were likely additional accounts that were removed from ARS's billing system and switched to the Apollo billing system that ARS was unable to identify because of the method by which the defendants falsified ARS's records and hid data, could provide a partial explanation as to why the monthly credit card revenue losses were higher than the monthly revenue losses from the 85 reconstructed customer accounts.

13

to be $1.4 million, but that by the time of the restitution hearing, one of the exhibits that Garegnani prepared and relied on demonstrated that ARS had lost credit card revenue of $6.5 million during the period after Green and his codefendant began switching customers to their company.  Green suggests that the difference in these numbers indicates that the evidence of ARS's claimed losses, as presented at the restitution hearing, was suspect and "unreliable" or "inaccurate."  However, at the time the probation report was prepared, the prosecution and ARS had not yet totaled all of the loss figures; although the probation report noted that at the time the probation officer spoke with Garegnani, ARS had identified $1,400,000 in losses, Garegnani also indicated that "the real loss to the company was probabl[y] three times that amount."  Thus, the probation report indicated that the losses to the victim were much higher than the number that ARS had been able to piece together at the time the probation officer spoke with Garegnani.

Green also suggests that the trial court should not have ordered him to pay restitution in an amount that would cover ARS's gross revenue losses, but instead, should have ordered restitution in an amount equal to ARS's lost "net" profits.  We disagree.  There is nothing in section 1202.4 that limits the calculation of "economic loss" to *net revenue*, rather than *gross revenue*, and "extensive case authority express[es] that restitution statutes are to be interpreted broadly and liberally."  (*In re Johnny M.* (2002) 100 Cal.App.4th 1128, 1132, fn. omitted.)  Further, as previously noted, a restitution order need not "be limited to the exact amount of the loss in which the defendant is actually found culpable," and it also need not reflect only the amount of damages that a victim might be able to recover in a civil action.  (*Carbajal, supra*, 10 Cal.4th at p. 1121.)  Thus, it has been held that "in the case of a commercial loss, [the profit referred to in section 1202.4] is reasonably

14

interpreted as meaning 'gross profit.' " (*People v. Thygesen* (1999) 69 Cal.App.4th 988, 994 (*Thygesen*).)

There is thus nothing unreasonable about the trial court's decision to rely on evidence of the gross revenue losses that were directly linked to the accounts stolen by Green and Siscon as its chosen method for calculating ARS's loss for purposes of restitution. As the *Thygesen* court explained, "Losses to victims will vary from case to case. For example, in a situation involving a victim who has a ring or necklace stolen, there may be no economic loss other than the actual value of the ring or necklace. The same is not true of a victim who is in business. *The economic loss may well include the loss of revenue the stolen item would have produced.*" (*Thygesen, supra,* 69 Cal.App.4th at p. 994, italics added.) In this case, ARS will still have to pay its employees and its other overhead costs during the period of time that it was losing revenue due to Green's and Siscon's scheme, making gross revenue a relevant and appropriate measure of its true loss. We therefore reject Green's suggestion that the trial court's restitution award constitutes an abuse of discretion because it is based on a calculation of lost gross revenue rather than on lost net profits.

Green also challenges the reliability of the evidence of loss because ARS appears not to have shown a profit in 2013, and showed only a slight profit in 2014, which was the "year after the defendant[ ]s purportedly stole ARS's clients." Green claims that this fact demonstrates that "ARS actually did <u>better</u>, with a profit of $15,240" after he and Siscon left the company. Green appears to contend that because there were periods of time when ARS did not make a net profit in its business, this means that he should not be liable for the revenue losses from the stolen customers that occurred as a result of his actions during this period of time. Specifically, Green suggests that the fact

15

that ARS "made <u>no profit in 2013</u>" somehow undermines Garegnani's assertion that ARS "had an 'average revenue' of $157,940.27 per month in October 2012 through August 2013" and renders her statement of "claimed loss based on gross figures, wholly unreliable and without the 'probable accuracy' that is required." We disagree with Green's premise. As we have explained, a court may award restitution representing lost gross revenues. Thus, there is nothing inherently problematic with the trial court's choice to award restitution that represents ARS's loss of gross revenue from the stolen customer accounts. Further, is it simply incorrect to assume that ARS did not suffer losses in the amount that it claimed simply because its profit and loss statements showed that there were periods of time when it was not making a profit, overall. There could be any number of reasons why a company might show a negative profit for a particular year—for example, certain one-time costs might have had to be covered one year but not the next, or the company may have made an investment in capital expenditures in the year showing no profit. This does not mean that that company could not have taken in significant gross revenue over that same period of time. Green points to nothing in the profit and loss statements that would demonstrate that Garegnani's testimony was not based on ARS's actual lost gross revenue figures or that her assertion regarding ARS's average gross revenue prior to the theft of its customers was inaccurate.

Green also attempts to undermine Garegnani's testimony about the revenue losses suffered by ARS by arguing that ARS had been sued by one of its wholesale providers of satellite service for breach of contract. He suggests that this fact "creates a reasonable inference that at least some customers left ARS during this period because of interruption to their airtime service." The trial court clearly rejected such an inference, and concluded instead that the

16

evidence demonstrated that ARS's loss of customers was attributable to the conduct of Green and Siscon, and was not a result of customers leaving of their own accord. Indeed, the $3.6 million restitution figure was directly linked to 85 accounts that Green and Siscon had switched over to the Apollo billing system and methodically wiped from ARS's billing system. There was e-mail evidence demonstrating that the defendants defrauded the customers about what was occurring when their accounts were transferred. In sum, the evidence supports the trial court's finding that the loss of customers was attributable to the defendants' conduct, not some alternative explanation.

In another attempt to undermine the basis for the court's restitution order, Green notes that in a prior civil lawsuit that ARS filed against a separate group of former employees, ARS sought civil damages based on claims similar to those it raised in this case, for a time period that overlapped the restitution period at issue in this case by two years, and that ARS failed to prove damages in the prior civil lawsuit. Green contends that this fact precludes ARS from obtaining restitution in this case. This argument is baseless.

As Garegnani explained in her testimony, ARS was able to obtain a permanent injunction in February 2013 to stop the former employees from taking ARS's customers. Garegnani clarified that while the former employees had migrated some of ARS's customers to its new company, those customers all returned to ARS after the injunction issued. Thus, there was sufficient evidence to support a finding that there were no overlapping losses between the two incidents. Further, whether ARS was able to establish damages in a civil action against different individuals has no bearing on whether the trial court abused its discretion in setting restitution for ARS's claimed losses in this matter. We reject the contention that what occurred in

17

an entirely separate proceeding involving different parties and different evidentiary rules operates to undermine the trial court's conclusions about the losses put forward by the victim and the prosecution in this criminal proceeding.

In sum, the trial court's decision to order approximately $3.6 million in restitution to ARS for losses suffered due to Green and Siscon stealing its customers and surreptitiously changing their billing from ARS to Apollo did not constitute an abuse of the court's discretion; the restitution order was rationally based on Garegnani's testimony about the number of customers that were stolen and the revenue losses that resulted from Green's and Siscon's actions. (See *Gemelli, supra*, 161 Cal.App.4th at p. 1542 [no abuse of discretion "where there is a rational and factual basis for the amount of restitution ordered"].)[12]

---

[12]     Less than a week before oral argument was scheduled to take place in this matter, Green filed a request for judicial notice in the direct appeal, case No. D076323, seeking to have this court take judicial notice of "the declarations and evidence submitted in support of the Return and Traverse which were filed with this court on January 27, 2021 and February 10, 2[021], respectively, in related habeas corpus matter, [c]ase No. D078067," as well as two new documents, submitted as "Exs. 1 and 2" attached to the request for judicial notice. Exhibit 1 is a "Name Change Amendment" filed with the California Secretary of State on January 13, 2021, in which Liberation Management Satellite, LLC (Liberation), ARS's parent company, notified the Secretary of State that it had changed its corporate name "in the jurisdiction of formation," and to which it attached a certification from the Rhode Island Secretary of State signed on January 12, 2021 indicating that Liberation had filed a name change amendment to change its corporate name in Rhode Island from "Liberation Management LLC" to "LIBERATION MANAGEMENT SATELLITE LLC," as of January 8, 2021. Exhibit 2 is a printout from the California Secretary of State's website purporting to show four of Liberation's filings with the Secretary of State's office, in 2002, 2017, 2020, and 2021. Green contends that this document demonstrates "that Liberation has not filed a Certificate of Correction to correct the false

2. *The trial court did not abuse its discretion in granting the prosecution's motion to quash Green's subpoena for ARS's tax returns*

Green contends that the trial court erred when it granted the prosecution's motion to quash his subpoena for ARS's tax returns. We conclude that the court did not abuse its discretion in granting the motion to

---

information included in the two previous documents." Green filed a corresponding request for judicial notice in the habeas corpus proceeding (case No. D078067) asking this court take judicial notice of Exhibits 1 and 2 in that proceeding, as well.

As to the "declarations and evidence submitted in support of the Return and Traverse" filed in the related habeas corpus proceeding, we conclude that our consolidation of case Nos. D076323 and D078067 renders moot Green's request that we take judicial notice of the documents filed in support of the Return and Traverse in the habeas corpus proceeding.

With respect to the two new documents of which Green seeks judicial notice in both the direct appeal and the habeas corpus proceeding, we decline to take judicial notice of those documents in this consolidated appeal. For purposes of raising issues related to Green's challenges on direct appeal from the judgment, "[r]eviewing courts generally do not take judicial notice of evidence not presented to the trial court," although in exceptional circumstances, an appellate court may, but is not required to, take judicial notice of material that was not presented to the trial court in the first instance. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.) We see no exceptional circumstances that would warrant this court deviating from the general rule regarding the consideration of new evidence in connection with a direct appeal.

We similarly decline to take judicial notice of Exhibits 1 and 2 for the purpose of addressing Green's habeas corpus petition. As we explain in section III.B., *post*, we are not persuaded that the evidence regarding ARS's parent company's status constitutes "new evidence" within the meaning of the statute governing petitions for writ of habeas corpus. In view of this conclusion, the additional evidence that Green seeks judicial notice of is not relevant to our consideration of the petition for habeas corpus, and we therefore decline to take judicial notice of these documents. (See *People v. Rowland* (1992) 4 Cal.4th 238, 268, fn. 6 [declining to take judicial notice of irrelevant records].)

19

quash the subpoena for the tax records. Further, even if we were to presume error, Green cannot establish that the court's ruling was prejudicial, given that he was provided with ARS's profit and loss statements and that his attorney essentially conceded that the tax records would not really help him in preparing Green's defense.

a. *Additional background*

After Green pled guilty and before the restitution hearing, Green served a subpoena duces tecum on ARS seeking the following:

> "1. Any documents that support the damages claimed in the restitution hearing.

> "2. Any documents that demonstrate your lost profits that you believe were caused by Apollo or Tim Green.

> "3. All financial statements for the years 2012-2018 to include but not be limited to profit and loss statements and balance sheets.

> "4. All corporate tax returns from 2012-2018.

> "5. Any documents that you intend to use to prove lost profits at the aforementioned restitution hearing.

> "6. Any documents that demonstrate how much each customer was paying you on a monthly basis for services that you provided for the customer and that you believe left [ARS] for Apollo."

In response to this subpoena, the prosecution moved to quash on the grounds that there is no general post-trial right to discovery, that Green failed to show good cause for the discovery, and that the documents requested were privileged. In the motion to quash, the prosecution argued that the defense had already been provided with 2,462 pages of discovery detailing the losses that ARS was able to reconstruct from the stolen files that were discovered in Green's home. The prosecution further indicated that it had

provided ARS's credit card merchant statements through 2015 to Green, and had agreed to provide additional credit card records through 2018.

Green argued that the subpoenaed documents were directly relevant to the restitution hearing and were not privileged.

At the hearing on the motion to quash, defense counsel conceded that the tax returns were "probably the least interesting documents I'm asking for" and further stated, "those don't really help me." Defense counsel went on to say, "What I really want to see are profit and loss statements because one of our arguments is that the restitution that they're seeking is based on gross profits, assuming they can even show causation on those gross profits." The prosecution agreed that the credit card receipts and profit and loss statements could be turned over to the defense without the necessity of an in camera review.

At the conclusion of the hearing, the trial court ordered:

> "That the victims are to turn over profit and loss statements from the period of 2013 through 2018. And all of these will be with a privacy order so that it's not to be disclosed to any other party. Victims are to turn over any credit card receipts for these 85 or so alleged customers from the period of 2013 through 2018. And any and all Excel, spreadsheets, or documentation, any software programs that talk about what they were – what the victims were paid on a monthly basis from these 85 or so customers, if they have it. I'm not going to order them to construct something that they cannot, which was as a result of the defendant's actions in deleting their records. So if they have it, it's to be turned over, if it's to be used at the restitution hearing. And all of these documents are with a privacy order attached."

The court stated that it would "not be ordering tax records to be turned over at this time."

21

### b. *Legal standards*

"A criminal defendant has a right to discovery by a subpoena duces tecum of third party records by showing 'the requested information will facilitate the ascertainment of the facts and a fair trial.' " (*People v. Superior Court* (*Barrett*) (2000) 80 Cal.App.4th 1305, 1316, holding modified in *Facebook Inc. v. Superior Court* (*Touchstone*) (2020) 10 Cal.5th 329, 345, fn. 6 (*Facebook*).) "The right of discovery in criminal cases is . . . not absolute. The court retains wide discretion to protect against the disclosure of information that might unduly hamper the prosecution or violate some other legitimate governmental interest." (*Barrett,* at p. 1316.) When a third party objects to disclosing the information sought in the subpoena, "the subpoenaing party must at that point establish good cause to acquire the subpoenaed records," or, "[in] other words . . . must show 'some cause for discovery other than "a mere desire for the benefit of all information." ' " (*Facebook*, at p. 344.)

With respect to questions regarding the disclosure of tax returns, "California courts . . . have interpreted state taxation statutes as creating a statutory privilege against disclosing tax returns." (*Li v. Yan* (2016) 247 Cal.App.4th 56, 66 (*Li*).) "The purpose of the privilege is to encourage voluntary filing of tax returns and truthful reporting of income, and thus to facilitate tax collection." (*Ibid.*) Although the privilege is not absolute, there are only three situations where the privilege may be considered defeated: "(1) the circumstances indicate an intentional waiver of the privilege; (2) the gravamen of the lawsuit is inconsistent with the privilege; or (3) a public policy greater than that of the confidentiality of tax returns is involved." (*Id.* at p. 67.) The last of these exceptions, however, is a narrow one, and " 'applies only "when warranted by a legislatively declared public policy." ' "

22

(*Ibid.*; quoting *Weingarten v. Superior Court* (2002) 102 Cal.App.4th 268, 274 (*Weingarten*).)

A trial court's ruling on discovery and evidentiary matters is reviewed for abuse of discretion. (*People v. Ayala* (2000) 23 Cal.4th 225, 299 [regarding abuse of discretion standard in discovery matters]; *People v. Venegas* (1998) 18 Cal.4th 47, 93 [regarding abuse of discretion standard in evidentiary matters].) "Exercises of discretion must be ' "grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue." ' " (*People v. Diaz* (2014) 227 Cal.App.4th 362, 377.) "The standard 'asks in substance whether the ruling in question "falls outside the bounds of reason" under the applicable law and the relevant facts.' " (*Ibid.*) " ' "The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice[,] a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power." ' " (*Dorman v. DWLC Corp.* (1995) 35 Cal.App.4th 1808, 1815.)

        c.   *The trial court did not abuse its discretion in granting the motion to quash the subpoena as it related to ARS's tax records*

The trial court did not err in exercising its discretion to grant the prosecution's motion to quash Green's subpoena for ARS's tax returns. As noted, during arguments regarding the motion to quash, Green's attorney essentially conceded that the tax returns were not necessary to Green's defense, stating that the returns "don't really help me." Counsel specifically mentioned that "what [he] really want[ed] to see are profit and loss statements," because he planned to argue that ARS was improperly seeking gross profits. Although counsel also later mentioned that he remained interested in the tax records so that he could "see the broadest, holistic

23

picture that I can," the trial court could have reasonably concluded that counsel's desire to get a "broad[ ] . . . picture" of the victim's finances did not constitute a "good cause" showing of a need for ARS's tax returns. (*Facebook, supra,* 10 Cal.5th at p. 344.) Defense counsel also responded affirmatively to the trial court's question concerning whether the profit and loss statements would fill in the missing information that Green needed, saying, "Right. So we're good with that." The prosecution and ARS agreed to provide Green with profit and loss statements. Further, given defense counsel's statement that the "primary focus" of Green's request for documents was ARS's profit and loss statements, the trial court could reasonably have taken counsel at his word that what he really wanted was not ARS's tax returns, but rather, other financial documents. Green was able to obtain the documents that his attorney indicated he was primarily interested in. We therefore cannot agree with Green that the trial court abused its discretion when it granted the prosecution's motion to quash Green's request for ARS's tax returns.

This is particularly so, given that the documents at issue were tax returns. Tax returns are statutorily privileged, and are entitled to remain private absent the three limited exceptions noted in section III.A.2.b, *ante*. (*Li, supra*, 247 Cal.App.4th at pp. 66–67.) There was no showing that any of these exceptions applied in this matter. For example, there was no demonstration that the privilege had been waived, or that the thrust of the case was not itself inconsistent with the privilege granted to tax returns. (See *id.* at p. 67.) Further, there has been no showing that this matter concerns "a public policy greater than that of the confidentiality of tax returns" (*ibid.*), particularly in view of counsel's admission that the tax returns were not necessary to assist in Green's defense with respect to the restitution issue. At least one court has specifically "caution[ed] against

24

compelled disclosure of personal tax returns except in those rare instances where the public policy underlying the tax privilege is outweighed by other compelling public policies or where waiver principles apply. The fact that financial records are difficult to obtain or that a tax return would be helpful, enlightening or the most efficient way to establish financial worth is not enough." (*Weingarten, supra*, 102 Cal.App.4th at p. 276.)

Green argues that the People's reliance on *Li, supra*, 247 Cal.App.4th 56 "for the general proposition that tax returns are privileged and subject to a privacy interest" is problematic because the People "fail to address the fact that *Li* dealt with the privacy interests of people, not business entities." Green argues that the "right of privacy in the California Constitution ([art. I,] § 1) is limited to 'people,' i.e., natural persons," and that because " ' "[t]he constitutional provision simply does not apply to corporations," ' " there should have been "little concern for privacy" in this matter. This argument is without merit. Even if there may be no general "right to privacy" for a corporation under the California Constitution, the basis for California's policy of protecting the confidentiality of *tax records* is based on the tax statutes, not the California Constitution, and the privilege granted to tax returns has been specifically extended to corporations. (*Schnabel v. Superior Court* (1993) 5 Cal.4th 704, 720 ["an equivalent statute cover[ing] bank and corporation tax" should be interpreted in an equivalent manner to "that part of the code dealing with personal income tax"; therefore, there exists a "privilege against forced disclosure of tax returns" of individuals, banks, and corporations].)

Given the privilege that applies to tax records, and given defense counsel's concession that ARS's tax records were not necessary or even

25

"helpful" to Green's defense, we conclude that the trial court did not abuse its discretion in quashing the subpoena as to ARS's tax records.[13]

B.  *Green's petition for habeas corpus relief*

Green contends that newly discovered evidence requires that the trial court's restitution order be vacated or reduced, or that the case be remanded for a new restitution hearing.  According to Green, after his sentencing and restitution hearing, he became aware of the fact that ARS's parent company, Liberation had its certificate of registration revoked by Rhode Island's Secretary of State on June 1, 2015.[14]  Green contends that as a result of the revocation of its parent company's certificate of registration in its home state, ARS was not authorized to conduct business in California after June 1, 2015, and that ARS therefore could not have suffered compensable business losses after that date.

We need not address the impact on ARS, in terms of its right to recover business losses for the period of time during which its parent company's certificate of registration in Rhode Island was revoked, because we are not persuaded that the evidence regarding ARS's parent company's status

---

[13]   Even if we had concluded that the trial court abused its discretion in quashing the subpoena as to ARS's tax records, Green has not established that the court's ruling prejudiced him, given his counsel's comments to the court to the effect that those records would not be particularly helpful to Green's defense, and Green's failure to demonstrate on appeal how the tax returns might have contained information that would have made a material difference to his defense.

[14]   At the hearing on the People's motion to quash the subpoena for ARS's financial records, the prosecutor stated that the victim in the case was "All Road Satellite," and that it "is a 'doing business as' name" for the "legal entity . . . Liberation Management, and we confirmed with the secretary of state website that they are active."

constitutes "new evidence" within the meaning of the statute governing petitions for writ of habeas corpus.[15]

Section 1473, subdivision (b)(3)(A) provides that a writ of habeas corpus should issue when "[n]ew evidence exists that is credible, material, presented without substantial delay, and of such decisive force and value that it would have more likely than not changed the outcome at trial." New evidence is defined as "evidence that has been discovered after trial, *that could not have been discovered prior to trial by the exercise of due diligence*, and is admissible and not merely cumulative, corroborative, collateral, or impeaching." (§ 1473, subd. (b)(3)(B), italics added.) This statutory habeas standard for new evidence is similar to the "new evidence" standard in a motion for new trial under California law. (See § 1181.)

Green's claim for relief is based on his contention that Liberation's Rhode Island business registration was revoked effective June 1, 2015, and that as a result, Liberation, ARS's parent company, was not legally doing business in California after that date. Rhode Island's revocation of Liberation's certificate of registration occurred more than three years before Green pled guilty in his criminal case, and four years before the restitution hearing occurred. Because the revocation occurred more than three years before Green pled guilty, he cannot now contend that this evidence did not exist at the time of his guilty plea or the restitution hearing. Further, in

---

15    As of January 8, 2021, Liberation's certificate of registration has been reinstated in Rhode Island, retroactive to June 1, 2015. Rhode Island law provides that "[w]ithin ten (10) years after issuing a certificate of revocation as provided in [Rhode Island General Laws Annotated] § 7-16-42, the secretary of state may withdraw the certificate of revocation and retroactively reinstate the limited-liability company in good standing *as if its certificate of organization or certificate of registration had not been revoked*." (7 R.I. Gen. Laws Ann. § 7-16-43 (West), italics added.)

2015 Liberation filed a separate civil lawsuit against Green, several years before the criminal complaint in this appeal was filed, providing Green with even more notice and time to investigate the relationship between ARS and Liberation, as well as their corporate standing.

Green cannot reasonably argue that he was unaware of Rhode Island's role in Liberation's corporate registration, given that Liberation's application for registration in California, which was filed in February 2002, clearly states that it existed as a "foreign limited liability company," and that it "was formed on November 18, 1999 in Rhode Island." Thus, Green was on notice that Rhode Island was Liberation's home state, and with minimal investigation, could have confirmed whether Liberation was in good standing in Rhode Island before entering his plea and subjecting himself to a restitution order. This is the type of evidence that could easily have been "discovered prior to trial by the exercise of due diligence." (§ 1473, subd. (b)(3)(B).)

Green nevertheless contends that he relied on the California Secretary of State's website and the district attorney's mistaken representation that Liberation was active in California, and argues that it would be "ironic" to contend that "while Liberation itself was purportedly 'unaware' of its own revocation, the petitioner should have been aware of it." He suggests that he "could not reasonably have been expected to know[ ] that Liberation's certification as an LLC had been revoked [in Rhode Island] because he relied on Liberation's own misrepresentations to the contrary." However, this argument does not directly address whether Green, through his own diligence, could have discovered the purported "new evidence." It seems clear that regardless of any statements made by the prosecutor or by ARS's representatives with respect to Liberation's filings with the Secretary of

State of California, Green could have, through basic means, discovered whether Liberation was in good standing in its home state.  It was incumbent on Green to fully investigate and to raise any concerns he might have had with respect to Liberation's corporate standing in the trial court.

Apart from blaming other parties, Green offers no reason why he could not have discovered that Liberation's Rhode Island registration was revoked years before he entered his guilty plea.  Green did investigate the matter more recently and discovered the 2015 Rhode Island revocation of Liberation's certificate of registration, presumably without assistance from the prosecutor or ARS.  There is no apparent reason why Green could not have undertaken a similar investigation at an earlier point in time.  We therefore conclude that the information that Green brings before this court in his petition for a writ of habeas corpus does not meet the Penal Code's definition of "new evidence."

## IV.

## DISPOSITION

The orders are affirmed.  The petition for a writ of habeas corpus is denied, and the order to show cause is discharged.


AARON, J.

WE CONCUR:


McCONNELL, P. J.


GUERRERO, J.

29